IN THE MATTER OF KURT E. JOHNSON, AN
ATTORNEY AT LAW.

Argued January 22, 1986—Decided May 20, 1986.

*Colette A. Coolbaugh,* Executive Counsel, argued the cause on behalf of the Disciplinary Review Board.

*Jonathan N. Harris* argued the cause for respondent (*Andora, Palmisano, Harris & Romano,* attorneys; *John P. Palmisano,* of counsel).

PER CURIAM.

Based upon a decision and recommendation of the Disciplinary Review Board (DRB or Board), this Court issued an order to show cause why respondent Kurt E. Johnson should not be disciplined. The Board determined that respondent had engaged in unethical conduct in violation of Disciplinary Rules 1–102(A)(4) and (5). The unethical conduct consisted of a misrepresentation

made by respondent to a trial court for the purpose of securing an adjournment of a case that was then being tried. The Board recommended that respondent be suspended from the practice of law for a three-month period as a result of such conduct.

The evidence in this case consisted of the testimony of witnesses who differed rather sharply as to the events critical to the charges. Consequently, the findings of essential facts are dependent upon a careful assessment of witness credibility and a comparative, probative weighing of testimony. The Board meticulously narrated this evidence in its determination. We have also independently reviewed the record and are satisfied that the Board's recapitulation of the evidence is complete and accurate.

The record discloses that respondent had been retained in 1980 by the Bomboleviches with respect to claims against a builder. The case was assigned by respondent to an associate in his office, who prepared and, in May 1982, undertook the trial of the matter. In the course of the trial, on May 25, 1982, the court ruled that the testimony of plaintiffs' expert would be restricted in scope. As a result of this ruling, the value of plaintiffs' case was drastically reduced. The clients were upset over this and arranged a meeting that evening to discuss the matter with respondent. Also concerned about the impact of the trial court's ruling, the associate secured an adjournment of the trial until 10 a.m. the following day. According to the DRB, "the associate was upset by the court's ruling, but had no health problems at that time."

The DRB describes the meeting between the Bomboleviches and respondent:

> At the meeting, the Bomboleviches expressed their dissatisfaction with the way their case was proceeding. Respondent told them he would "cancel tomorrow out." This would give Respondent five days to study the court's ruling since Memorial Day was observed on the following Monday. Respondent told them the associate "might become sick." The Bomboleviches were instructed by Respondent not to go to the courthouse the following morning. Mr. Bombolevich testified that the Respondent would take care of the associate

"having a sick day." According to Mr. Bombolevich, there was no further discussion about the associate's health.

Respondent's testimony differed, *viz:*

Respondent * * * contended that [the Bomboleviches] discussed the fact that the associate appeared to be ill. Respondent maintained that the Bomboleviches informed him that the associate had become discomposed at the hearing. Respondent concluded from this conversation with his clients that his associate had become very "ashen." Respondent stated that if the associate were ill then the trial could not continue the following day. Respondent claims he told the Bomboleviches that his firm would attempt to postpone the trial, but if this was not successful, they would either have a neighbor witness testify or they would deliberately prolong the engineer's testimony so he would have to resume Tuesday.

Respondent stated he was unable to reach his associate that evening after the meeting. The associate, however, claimed he was not able to contact respondent, and thereafter telephoned Mr. Bombolevich, who stated that he and his wife had been instructed by respondent not to attend court the following day because respondent was going to obtain an adjournment. This conversation, we note, was not verified by Mr. Bombolevich. There then occurred a telephone conversation between the associate and respondent, at 7 a.m. on May 26, 1983, pertaining to prolonging or adjourning the trial. "The associate maintained," as restated by the DRB, "that respondent told him that the case would be adjourned and for the associate to report to the law office." But,

Respondent claimed they discussed various options, such as having the neighbor testify, adjourning the trial and the fact that the associate "was not feeling well" due to either a stomach or backache. Respondent maintained that he left to his associate's discretion that if he was not feeling well enough to continue with the trial then that was the answer and they did not have to discuss the other alternatives.

Respondent and the associate then met later that morning at their law office. The associate stated this occurred at approximately 9 a.m. and that upon arriving at the office he "did not ask respondent if the trial had been adjourned." According to respondent, this meeting occurred shortly after 7:30 a.m. Additionally, respondent claims that in the course of his morning

discussion with his secretary, he had indicated that "the associate was not feeling well."

The DRB recapitulated the important events that followed:

About 10:20 a.m., the trial judge's secretary telephoned Respondent's law office and spoke with [respondent's] secretary, Mrs. Barbara Ziegner. The judge's secretary was inquiring about the whereabouts of the associate. Mrs. Ziegner interrupted Respondent who was in conference with a client and reported the telephone call. Respondent again told her the associate was ill. [This message was communicated by Mrs. Ziegner to the judge's secretary]. Shortly thereafter, the trial judge called and asked the secretary for the associate's telephone number. Mrs. Ziegner tried dialing the number but there was no response. She then gave the judge the number. According to Mrs. Ziegner, the trial judge was angry. She did not recall what she specifically told Respondent about the telephone call from the trial judge or his secretary. She did not believe she told the judge or his secretary that Respondent was not in the office. She did not recall if the judge asked her to put Respondent on the telephone. Mrs. Ziegner did not go to the front area of the office where the associate had his office, nor did she buzz the associate's office to determine his presence. She said that after the telephone call there was confusion in the office and everybody was upset by it.

The Board also summarized the testimony of the trial judge with respect to this telephone exchange:

The trial judge placed on the record that he telephoned Respondent's office at 10:25 a.m. and that Respondent's secretary said she thought the associate had injured his back and was not prepared to be in court that morning. The secretary told the judge that she thought the associate had called the court on his own. She could not respond to the judge's question as to why the plaintiffs were not in court.

The DRB further indicated that at 10:30 a.m. the trial judge noted on the record his conversation with respondent's office concerning the whereabouts of the trial attorney and that he then dismissed the case with prejudice.

Immediately following the trial judge's telephone call, the secretary testified she was surprised to see the associate in the office, telling him that "she thought he was ill" and that she had informed the trial judge he had injured his back and would not be in court. She stated further that the associate was "upset by this news" and had instructed her to reach respondent.

The associate's version as to what transpired in the office subsequent to his learning of the trial judge's telephone call, as narrated by the DRB, was as follows:

The associate met with Respondent in the office library. The associate said he told Respondent that something had to be done immediately because no one had called the court to adjourn the trial and the court was given false information. Respondent also was upset when the associate informed him that the case had not been adjourned. The two attorneys discussed the various options they had such as continuing with the trial, adjourning it or seeking an interlocutory appeal. It was decided that the associate was to go to court, explain the mix-up and seek an adjournment. The associate then telephoned the clients and informed them that the case was continuing. The associate also telephoned the expert witness to alert him as to the possibility of testifying that day. The associate left for court at 11 a.m.

Respondent's version of this meeting differed. He claimed that when the secretary told him of the judge's telephone call, he immediately sought out the associate and demanded to know why "nothing had been done about adjourning the trial." According to respondent, he told the associate that it was the associate's responsibility to have obtained the adjournment. Respondent directed the associate to telephone the clients and to thereafter leave for the courthouse. Respondent also claimed he instructed one of his secretaries to call the trial judge and advise him that the associate was on his way.

Shortly after the trial court dismissed the case, the defense attorney, with the trial judge's permission, telephoned respondent's office at 10:50 a.m., pretending to be another person whom respondent knew; he was told over the telephone that respondent was in conference with the assumed caller's wife. Respondent took the call and recognized the voice of the defense attorney, who then inquired as to the status of the trial. Respondent, according to the DRB, told the defense attorney that his "associate was on his way to court with the clients and 'they are ready to proceed with the trial,' * * * [adding] that he was 'prepping or finishing prepping' the expert witness."

The determination of the DRB continues:

The associate arrived at court at 11:30 a.m. When queried about his reportedly bad back, the associate explained that several weeks earlier he did suffer a back problem and apparently "that got translated back to this morning. It wasn't that." The associate added that earlier that morning Respondent informed him that Respondent would ask for an adjournment so an interlocutory appeal could be filed. The trial judge replied that he had received no request for an adjournment. The judge then said he was inclined to vacate the dismissal order if there were a good explanation and the plaintiffs were ready to proceed. The judge noted that Respondent never told the court or his adversary that he would seek an adjournment so he could file an appeal but instead said they would proceed with trial. After a colloquy with the attorneys, the judge announced that the case would remain dismissed with prejudice. With the jury present, the judge again dismissed the case, explaining that the plaintiffs were not prepared to continue.

After the jury was excused, the associate reiterated the incident for the record. He noted that in his conversation with Respondent, he asked Respondent if the case was worth anything because he, the associate, only had two days left with the firm. Respondent's purported reply was that he felt the court's decision was in error. After further discussion, the associate stated that the clients were en route to court and the expert was on standby. The judge expressed surprise at only then being advised that the clients were prepared to proceed.

The trial judge held a hearing on June 3, 1983, regarding the events of May 26, 1983. The judge reviewed his efforts on that day to locate the associate and the response from respondent's office. Respondent indicated at the hearing that he was uncertain as to when he first saw the associate on the morning of May 26th. He acknowledged that the adjournment request was not handled properly, and claimed there was a mix-up between him and his associate. After the hearing, the trial judge referred the matter to the District Ethics Committee.

As noted previously, we concur entirely with the assessment of the record made by the DRB and independently reach the same conclusion. Clear and convincing evidence fully supports the finding that respondent engaged in unethical conduct. We reiterate the Board's determination:

The facts clearly reveal that Respondent contrived an excuse to delay his clients' trial. He needed time to review the court's ruling so he could determine what action he should take to salvage his clients' claim for damages. Without knowing the status of the health of his associate, Respondent laid the ground work for an adjournment based on his associate's illness. Respondent told the client that the associate might become sick, and suggested to the associate that

one option for adjournment would be illness. Respondent sought to bolster this delay tactic by twice informing his secretary that the associate was ill. Assuming arguendo that the associate was somehow ailing, his alleged illness did not deter him from coming to the office to work of which fact Respondent was aware. Respondent had no credible reason to believe that he was unfit to continue the trial. It is evident that Respondent strongly suggested to his associate that the associate ask the court to delay the trial because of illness. His associate, however, did not telephone the court. Respondent never informed the court or the defense attorney that he would be seeking an adjournment. Instead, Respondent belatedly conveyed the message that they would be continuing the trial. He compounded his lack of candor when he later misrepresented to the court the time, nature and length of his conference with his associate.

These circumstances are not outweighed by the fact of respondent's prior unblemished record or that the transgression apparently embraced a single incident, not a pattern of conduct. The DRB quite appropriately observed that respondent's actions could not be explained by inexperience or ineptitude. It concluded that

this [single incident] was a deliberate attempt by Respondent to deceive the court. Not only did Respondent seek to mislead the court, he was less than candid in his attempt to avoid any responsibility for the misconduct. His machinations not only prejudiced his clients but demeaned the entire legal profession.

We conclude, in accord with the District Ethics Committee, to which the case was initially presented, and the DRB, that respondent made a deliberate misrepresentation to the court that was prejudicial to the administration of justice, contrary to Disciplinary Rules 1–102(A)(4) and (5). This is a most serious breach of ethics because it affects directly the administration of justice.

In considering the extent of discipline we have observed that certain kinds of ethical offenses appropriately warrant *per se* disbarment or other severe discipline. In such cases, we do not quantify an attorney's misconduct. *E.g., In re Wilson,* 81 *N.J.* 451 (1979). Ethical transgressions of this cast are by their very occurrence conclusively determinative of the attorney's unfitness to remain in the profession. *Ibid.* In other situations, however, the nature or quality of wrongdoing must be combined with its deleterious effects to measure the full import of

the ethical breach. The extensiveness of particular ethical wrongdoing in terms of actual harm can be important in determining ultimate discipline. *Compare In re Hughes*, 90 *N.J.* 32 (1982), *with In re Kushner*, 101 *N.J.* 397 (1986).

In this case, the ethical breach is grave because it intruded directly into the trial of a litigated case. The misconduct thus impacted upon the administration of justice and seriously compromised an attorney's paramount duty to act at all times as an officer of the court in effectuating the proper administration of justice. *See In the Matter of Silber*, 100 *N.J.* 517 (1985); *In re Turner*, 83 *N.J.* 536 (1980). We discount accordingly, the fact that respondent's misdeed was perpetrated only for the purpose of securing an adjournment of an ongoing trial, not toward something that could be more nefarious or more subversive to the administration of justice. The offense, however, is not garden-variety misconduct. Lying to a judge—no matter how white the lie—can never be lightly passed off. The destructive potential of such conduct to the justice system warrants stern sanction.

Accordingly, we determine that appropriate discipline shall be suspension from the practice of law for three months. Respondent is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

## ORDER

It is ORDERED that KURT E. JOHNSON of HACKENSACK, who was admitted to the bar of this State in 1969, be suspended from the practice of law for a period of three months, effective June 16, 1986, and until the further order of this Court; and it is further

ORDERED that KURT E. JOHNSON reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that KURT E. JOHNSON be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that KURT E. JOHNSON comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

*For suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.