IN THE MATTER OF THOMAS K.J. TUSO, AN ATTORNEY-AT-LAW.

Argued June 5, 1986—Decided September 26, 1986.

*Robyn M. Hill,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Vincent J. Pancari* argued the cause on behalf of respondent (*Pancari, Zerella, Tedesco & Pancari,* attorneys).

PER CURIAM.

This matter is before us to consider the Decision and Recommendation of the Disciplinary Review Board (DRB or Board) determining that respondent, Thomas K.J. Tuso, was guilty of ethical misconduct deserving of disbarment. The Board rendered its determination on a motion for final discipline filed by the Office of Attorney Ethics. The basis for the motion was respondent's convictions in April 1977 of conspiracy to commit bribery and solicitation of misconduct and two counts of offering a bribe, contrary to the former criminal statute *N.J.S.A.* 2A:98–1, and 2A:93–6 (repealed *L.*1978, *c.* 95, *N.J.S.A.* 2C:98–2).

Respondent was sentenced to three concurrent 12 to 18 month prison terms on May 31, 1977. In an unpublished opinion the Appellate Division on March 20, 1979, affirmed the conviction. Respondent's petition for certification to this Court was denied on May 30, 1979. 81 *N.J.* 270. Respondent was temporarily suspended from the practice of law on June 26, 1979. Thereafter, the Office of Attorney Ethics requested the DRB to recommend to the Supreme Court that respondent be disbarred. Respondent filed a notice of motion to transfer to the inactive status pursuant to *Rule* 1:20–9(d), which was denied.

I.

■ The charges of ethics violations against respondent are evidenced by judgments of convictions. A judgment of conviction is conclusive evidence of respondent's guilt. *In re Hughes,* 90 *N.J.* 32, 36 (1982); *In re Mirabelli,* 79 *N.J.* 597, 602 (1979). A conviction of crime that encompasses the conduct constituting ethical wrongdoing obviates the need to make an independent examination of underlying facts in order to ascertain guilt. *In re Bricker,* 90 *N.J.* 6, 10 (1982); *see In re Coruzzi,* 98 *N.J.* 77 (1984). Respondent's convictions establish beyond dispute that he had engaged in illegal conduct that adversely reflected on his fitness to practice law. *RPC* 8.4(b) (*DR* 1–102(A)(3)).

██ In these circumstances the extent of final discipline to be imposed is the only issue to be determined. *R.* 1:20–6(b)(2)(ii). A number of factors bear upon this inquiry. Among these are the nature and severity of the crime and whether the crime was related to the practice of law. Mitigating factors, such as the attorney's professional reputation, prior trustworthy professional conduct, and general good character, are relevant. *See In re Kushner,* 101 *N.J.* 397, 400–01 (1986).

In considering appropriate discipline, the DRB, while accepting the conclusive effect of the criminal convictions, carefully reviewed the record to explore the nature and severity of the underlying crime. We have independently examined the record and based upon that review confirm the factual recapitulation of the Board.

The record reveals that in March 1975 respondent was contacted by a partner in an architectural firm that was seeking a contract with the Cumberland County Regional School Board in connection with construction of a regional high school. The architectural firm had received no response to a bid it had submitted and it had suspicion that another firm had engaged in "pay-offs." Respondent later undertook to represent this firm for an amount set at 5% of the firm's anticipated fee. Respondent then met with Clarence Custis, who was in charge of the school board's search committee. According to Custis, respondent was willing to share his legal fee. Custis contends that he became indignant at this suggestion and started to leave the room.

The DRB noted that respondent had a different version of this meeting:

According to respondent, Custis did not have a good reason for failing to interview the architectural firm. When respondent attempted to describe the qualifications of the firm, Custis commented at length on his financial problems and outstanding business debts. Respondent concluded that all Custis wanted to discuss was what he would obtain for himself if the architectural firm was interviewed. Respondent claimed he told Custis he did not want to get involved. When Custis started to leave, he told respondent that these things were commonplace and stormed out of the office. Respondent denied stating

that he would give Custis a percentage of his legal fee or that he or the architectural firm would give Custis any illegal payment. However, respondent was sympathetic to Custis's financial problems and offered to help in his capacity as an attorney.

The record discloses that Custis informed the school board of this incident and then informed the County Prosecutor through his personal attorney. In June 1975, respondent renewed his contact with Custis who recorded their conversations.

The DRB report states:

Custis questioned respondent concerning the arrangement respondent had with the architectural firm. Respondent telephoned the firm. Respondent then indicated that he knew what his fee would be and wrote the figure $20,000 on a piece of paper and showed it to Custis. Respondent then tore the paper and threw it away. When Custis inquired as to what portion of the figure would be his fee, respondent wrote 50%, then tore the paper from the pad and threw it away.

Conversely, respondent denied writing $20,000 or $10,000 on a piece of paper. He claimed that while he was speaking on the telephone, he wrote the number 50 on a piece of paper as a doodle and threw it away. Respondent maintained he did not show Custis this figure and that he made no improper offers at that time. On July 1, Custis received a telephone call from the architectural firm partner but Custis would not talk with him, pretending he was ill. Following an interim meeting concerning an $850 payment to Custis on July 16, 1975, Custis telephoned respondent to arrange for a meeting on July 22. That conversation was recorded. Custis informed respondent that the architectural firm would soon be receiving a letter that it was being considered for the school contract. Custis mentioned the possibility of his going bankrupt and stated he wanted to meet with the architectural firm partner. A meeting was arranged for July 22, 1975.

Respondent met Custis in a restaurant on July 22, 1975. The architectural firm partner was not present. The conversation was recorded. Custis stated that he needed one thousand dollars for a problem he had regarding withholding unemployment compensation funds. Respondent, telephoned the architect. When the call was concluded, respondent told Custis that the additional money had been approved. Custis would receive $1,850 once the contract was given. Respondent, however, denied telling Custis that he would give him $850 or any amount, nor did he tell Custis he would get help from the architectural firm. Respondent claimed he only offered to contact some people on Custis's behalf as an attorney would do in representing a client. Later that same evening, Custis in a recorded conversation, telephoned the architect from a State Police barracks. Custis indicated that the firm had been selected as the architect for the proposed school.

Thereafter, on July 25, 1975 respondent was confronted by law-enforcement authorities. While respondent initially prevar-

icated and denied culpability, he later recounted his involvement. According to the DRB:

> Respondent described the initial meeting with the architectural firm partner. He admitted offering Custis $3,000 to $5,000 at their initial meeting. He also related how during the second meeting with Custis, he learned on the telephone from the architectural firm partner that his fee would be 5% of the firm's $500,000 or $25,000. He admitted writing the $20,000 and 50% figures on pieces of paper at that time and showing them to Custis. He also acknowledged that he had discussed the $850 and $1,000 payments with Custis and the architect. Respondent also stated that the partner was aware that continuing payments were to be made to Custis during the life of the contract. Respondent's telephone attempts to contact the architectural firm partner were unsuccessful. The State Police detective, the deputy attorney general and respondent left the apartment and went to a restaurant for dinner. Respondent acknowledged that he would receive his fee in cash and that he intended to offer Custis money and to pay in cash. Respondent maintained that he thought he had done nothing wrong because the contract was going to what he considered to be the best firm and another architect was paying to obtain the contract.

The DRB also noted respondent's different versions of this sequence of events:

> Respondent maintained he had continuously denied participating in the scheme throughout his discussions with the detective and the deputy attorney general. Although respondent admitted dealing with Curtis, he denied committing any crime. When he spoke with the Attorney General, respondent requested a meeting so he could present his side of the matter to show he had done nothing criminal. Respondent contended that the detective and the deputy attorney general wanted him to call the architectural firm partner in order to bait him. Respondent agreed because he felt the telephone call would vindicate him. Respondent further contended he never admitted making a bribe or offering any amount and never admitted conspiring with the architectural firm partner.

As amplified by the underlying facts, it is glaringly apparent that respondent committed grave criminal acts and, by virtue of his convictions, is indisputably guilty. He engaged in a pernicious, sustained, and adroit attempt to corrupt a public official, a school board member, to serve his own financial ends. We have said, sadly too often, that bribery of a public official is a "blight that destroys the very fabric of government." *In re Callahan,* 70 *N.J.* 178, 184 (1976); *see In re Sabatino,* 65 *N.J.* 548, 554 (1974). Few crimes other than bribery of a public official so tellingly demonstrate an attorney's lack of honesty, respect for law, and trustworthiness as an officer of the courts.

The crime itself is equated with unfitness to practice law. *In re Hughes, supra,* 90 *N.J.* at 36. Bribery of a public official has devastating consequences to the bar, the bench, and the public, and especially the public's confidence in the legal system. No sanction short of disbarment will suffice to repair the damage. [*Id.* at 37.]

Respondent offers as an extenuating factor that he was suffering from a psychological condition, referred to as "burnout." Personal or emotional problems and physical or mental disability or impairment are mitigating factors. We observed in *In re Templeton,* 99 *N.J.* 365, 373–74 (1985):

In all disciplinary cases, we have felt constrained as a matter of fairness to the public, to the charged attorney, and to the justice system, to search diligently for some credible reason other than professional and personal immorality that could serve to explain, and perhaps extenuate, egregious misconduct. We have always permitted a charged attorney to show, if at all possible, that the root of the transgressions is not intractable dishonesty, venality, immorality, or incompetence. We generally acknowledge the possibility that the determinative cause of wrongdoing might be some mental, emotional, or psychological state or medical condition that is not obvious and, if present, could be corrected through treatment.

The Board carefully reviewed the medical and psychiatric reports respondent submitted and found no causal connection between respondent's misconduct and his illness. We have also closely heeded this evidence and weighed it sympathetically. The Board concluded, and we agree, that the medical explanations of respondent's conduct failed to demonstrate that he suffered a loss of competency, comprehension, or will of a magnitude that could excuse his egregious misconduct; the medical etiology of respondent's course of conduct does not suggest that his actions were not clearly knowing, volitional, and purposeful. *See In re Jacob,* 95 *N.J.* 132, 137 (1984). Moreover, his medical condition in no way dispels the damning fact that respondent's calculated course of conduct was designed to secure personal gain.

The Board did note as mitigating factors that respondent, who was admitted to the Bar in 1960, had no prior disciplinary history. He also rendered community service, including service as a municipal court judge. However, the mitigating factors do

not outweigh the aggravating factor of respondent's crime. This was not a single, aberrational act. Respondent, over a period of months, participated in a calculated scheme to corrupt a public official and subvert government standards for fair and competitive bidding. The discipline to be imposed must accord with the seriousness of the misconduct in light of all relevant circumstances. *In re Nigohosian*, 88 *N.J.* 308, 315 (1982).

> Disbarment is reserved for the case in which the misconduct of an attorney is so immoral, venal, corrupt or criminal as to destroy totally any vestige of confidence that the individual could ever again practice in conformity with the standards of the profession. Disbarment is a guarantee to the public that the attorney will not return to the profession. [*In re Templeton, supra,* 99 *N.J.* at 376.]

■ Respondent's conduct leaves the Court without any confidence that respondent could ever again practice law in conformity with the standards of the profession or that the public could reasonably believe that respondent could again become a trustworthy and responsible member of the bar. *See In re Hughes, supra,* 90 *N.J.* at 39.

Under the circumstances, disbarment is the only appropriate discipline. We so order. We further direct respondent to reimburse the Ethics Financial Committee for appropriate administrative costs, including production of transcripts.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.

## ORDER

It is ORDERED that THOMAS K.J. TUSO of VINELAND, who was admitted to the bar of this State in 1960, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that THOMAS K.J. TUSO be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Ethics Committee for appropriate administrative costs, including production of transcripts.