IN THE MATTER OF DONALD R. CONWAY, AN
ATTORNEY-AT-LAW.

Argued January 23, 1986—Decided June 10, 1987.

*Thomas J. McCormick,* Assistant Ethics Counsel, argued the
cause on behalf of Office of Attorney Ethics.

*Justin P. Walder* argued the cause for respondent (*Walder, Sondak, Berkeley & Brogan,* attorneys; *Justin P. Walder, Dominic J. Aprile* and *John A. Brogan,* on the brief).

PER CURIAM.

This attorney-disciplinary case is before us upon the Decision and Recommendation of the Disciplinary Review Board (DRB or Board), determining that respondent, Donald Conway, was guilty of unethical conduct and should be publicly disciplined. The conduct that gave rise to this disciplinary proceeding was also the basis of a criminal indictment and prosecution against respondent, which resulted in convictions for conspiracy, in violation of *N.J.S.A.* 2C:5–2, and tampering with a witness, contrary to *N.J.S.A.* 2C:28–5a(1), (2) and *N.J.S.A.* 2C:2–6.

The DRB correctly recognized that the judgments of conviction were conclusive evidence of respondent's guilt. Rule 1:20–6(b)(1). Accordingly, it determined that respondent's conduct, as established by his convictions, constituted a breach of ethics that was prejudicial to the administration of justice and adversely reflected on his fitness to practice law, contrary to Disciplinary Rules 1:102(A)(3), (5) and (6). The DRB further noted that while there was no need to make an independent examination of the underlying facts to ascertain whether respondent was guilty of unethical conduct, the underlying facts were essential to an understanding of the gravity of respondent's misconduct and the extent of final discipline to be imposed. Rule 1:20–6(b)(2)(ii). The Board concluded unanimously that "disbarment would be too severe" and recommended that respondent be suspended for three years retroactive to the date of his temporary suspension, which was February 16, 1984.

I.

We note, as did the DRB, that respondent's criminal convictions are conclusive evidence of his guilt and serve to establish the essential facts that sustain the convictions. *R.*

1:20–6(b)(1); *see, e.g., Matter of Coruzzi,* 98 *N.J.* 77 (1984); *Matter of Hughes,* 90 *N.J.* 32 (1982); *Matter of Bricker,* 90 *N.J.* 6, 10 (1982). By virtue of his criminal convictions, respondent comes before us guilty of a breach of ethics involving the crimes of conspiracy and tampering with a witness; these crimes were committed in the course of respondent's representation of a defendant in a criminal prosecution. Lending emphasis to the dispositive weight to be accorded respondent's criminal convictions is the added consideration that the validity of these convictions has been subject to scrupulous judicial review by the Appellate Division in its affirmance of the criminal convictions, *State v. Conway,* 193 *N.J.Super.* 133 (App.Div. 1984), and by this Court in its denial of certification, *certif. den.,* 97 *N.J.* 650 (1984). Moreover, in this disciplinary proceeding, the DRB has independently considered the facts and presented its essential findings in its Decision and Recommendation with respect to the imposition of discipline. We have been assisted by its thorough analysis of the factual record in engaging in our own independent examination of that record. Thus, the facts in the case have been exhaustively reviewed and are now firmly and independently established.

To reiterate, because a criminal conviction is given conclusive effect, the underlying facts in support of the conviction need not be independently reviewed in order to determine whether a breach of ethics has occurred. The facts, however, may be considered in assessing the appropriateness of discipline and the severity of the sanction to be imposed. *See Matter of Johnson,* 102 *N.J.* 504 (1986); *Matter of Rosen,* 88 *N.J.* 1 (1981). Accordingly, in dealing with this issue, we focus first upon the underlying facts and then turn to an assessment of these facts in order to determine the appropriate discipline.

## II.

This matter originated out of an altercation between Philip Lombardo, Jr. and a state police officer, Denis McDowell. The

incident occurred during the early morning hours of Sunday, July 19, 1981, outside an establishment known as the Surf Club in Dover Township, which club was owned and operated by Joseph Barcellona. In the past, McDowell had been employed occasionally at this club when not on duty.

Prior to the McDowell-Lombardo altercation, Lombardo had been ousted from the club for objectionable behavior. Instead of leaving the area, however, Lombardo remained outside the establishment. McDowell, who was present at the club, observed Lombardo acting suspiciously and frisked him; he allegedly found a can of tear gas. Later that evening, as the club was closing, Lombardo banged on the door and, when it was opened by McDowell, threw a substance in McDowell's face. McDowell chased Lombardo, calling: "Halt, I'm a police officer." McDowell finally apprehended Lombardo when the latter attempted to get into his automobile. A struggle ensued in the car, during which Lombardo tried to grab an object, which also contained tear gas. With the aid of several employees of the Surf Club, Lombardo was subdued and taken into the Club. While inside, Lombardo stated: "I told you I would get even," and boasted that he had "family connections" who run New York and New Jersey, and that by one phone call he could have those who restrained him "taken care of."

On the following day, McDowell prepared a two-page report on the altercation on a New Jersey State Police form. Lombardo was charged with two counts of possession of tear gas, contrary to *N.J.S.A.* 2C:39-4, a third degree crime; one count of simple assault, contrary to *N.J.S.A.* 2C:12-1, a disorderly persons offense, and an "additional charge" of resisting arrest, contrary to *N.J.S.A.* 2C:29-2, a fourth degree crime if physical force is used against the officer. Although McDowell prepared this report, it was not processed.

On the same day, July 20, 1981, Lombardo retained respondent as his attorney. As noted by the DRB, respondent is a close friend of Vincent Rigolosi, Esq., as well as his business

partner in a building in which their respective separate law offices are located. Respondent knew that Rigolosi was friendly with Joseph Barcellona and his family and had represented Joseph Barcellona in the past. Respondent spoke to Rigolosi about the McDowell-Lombardo incident, and mentioned that he was considering filing cross-complaints as well as a civil action against Barcellona and the Surf Club. They—respondent and Rigolosi—scheduled a meeting with Barcellona to see if the Lombardo matter might be disposed of amicably without litigation.

Meanwhile, at 8 p.m. on July 21, 1981, McDowell received a phone call at his home from Joseph Lazaro, a state police sergeant and Barcellona's cousin, asking him to come to Barcellona's apartment. McDowell knew and respected Lazaro, who had helped McDowell join the state police. McDowell went to Barcellona's apartment on July 22, and spoke to Lazaro before Barcellona's arrival. According to McDowell, Lazaro told him "that there might be some problems with my family, and that the person involved was, in fact, a member of the Vito Genovese family." McDowell understood this to mean that his family might be in danger. Later, after Barcellona arrived, McDowell recounted the events surrounding Lombardo's arrest, including the comments made regarding Lombardo's "connections." Barcellona was angry about the incident, particularly about Lombardo's comments. He told McDowell that he had received a telephone call from Rigolosi about possible counter-complaints and a lawsuit against Barcellona.

On July 22, 1981, respondent met Barcellona for the first time in Rigolosi's office at which meeting the matter was discussed. Respondent stated that his client would not file counter-complaints if McDowell would withdraw his charges. Barcellona replied that he "would be more than happy to resolve it by having the charges dropped." At a later date, Barcellona stated with reference to this meeting, according to a tape recording, that respondent had "begged" him to do "any-

thing that can be done ... I mean anything," to drop the charges.

McDowell next heard from Barcellona by phone at approximately 7:30 p.m. on July 22, 1981.[1] At Barcellona's request, another meeting was arranged. By now, McDowell's suspicions were aroused and, before that meeting, McDowell conferred with a superior officer at division headquarters about what had transpired and was instructed to record future conversations with Barcellona.

McDowell used a recording device in all further meetings regarding this matter. He met with Barcellona and Lazaro at Barcellona's apartment on the night of July 24, 1981. At the outset of this conversation, and apparently before the arrival of Barcellona, Lazaro informed McDowell that Lombardo's father has "been in the ... Vito Genovese family for a long, long time." He then said that one Al Washnick [alias Alan Grecco] approached Barcellona and stated: "Joe, if you could do this for us, anything the kid [McDowell] wants, he's got. We're talking five, ten, you name it, whatever." A discussion then ensued in which McDowell noted that the "report has not been turned in yet." McDowell and Lazaro discussed ways of composing a new and different report, and Lazaro concluded that there was "no risk of anything because I know the way it could be handled. You just gotta be smart on your end, that's all, you know ... I know you could use the bucks, nobody else is taking a cut on anything, you know." At that point, Barcellona entered the room, and Lazaro informed him that McDowell had "knocked out his report but ... hasn't submitted it yet." Barcellona related that he had met with members of the "families" who were upset with Lombardo's comment about being "connected" and wanted Barcellona to do what he could to resolve the matter.

---

[1]This was about an hour or so after the Conway-Rigolosi-Barcellona meeting in Rigolosi's office.

At this meeting of July 24, Barcellona stated that when he met with Rigolosi and respondent, he asked "Vince"—Rigolosi —whether he should talk. Rigolosi assured Barcellona, in respondent's presence, that he, Barcellona, should talk, explaining that respondent was a friend who will not "put anything on paper." Then, according to Barcellona, Rigolosi said: "And the guy [respondent] actually begged me to say anything that can be done. He says I mean anything." Barcellona also told McDowell that respondent stated that he did not believe Lombardo's story about the events of July 19, 1981.

The July 24 conversation among McDowell, Lazaro and Barcellona included a discussion of the price to be paid for McDowell's altering of his report and how and through whom the money would be passed. It was established that Barcellona had asked Lazaro to approach McDowell and inform him that Alan Grecco offered to pay $10,000 to get the charges against Lombardo dismissed. McDowell asked to meet with Lombardo or Grecco and, at the close of the meeting, Lazaro telephoned his uncle, Samuel Lazzara, to arrange a meeting between Grecco, McDowell and himself.

The following evening, Lazaro met Grecco at Lazzara's home. Grecco would not permit McDowell to be present at this meeting. The two men discussed altering the arrest report or, in the alternative, having McDowell fail to identify Lombardo in a line-up. Grecco refused to allow McDowell to meet with Lombardo, stating that "our attorneys would get the reports" and "would be able to handle that."

Shortly after this meeting, Lazaro returned to Lazzara's home and received $5,000 to give to McDowell. Lazaro was told that the money was from Grecco and that McDowell would receive $5,000 now and $5,000 "when its done."

On July 25, 1981 at 2:10 a.m., McDowell recorded a telephone conversation between himself and Lazaro. In the course of this discussion, McDowell stated that he could "... make a soft report that would leave, give them a lot of loopholes." How-

ever, McDowell added that he wanted "assurance" from Lombardo, Sr. "that whatever story we agree on he [Lombardo, Jr.] sticks to."

Another recorded meeting took place on the night of July 25, 1981, between McDowell and Lazaro at the Surf Club. At this meeting, Lazaro recounted the circumstances of McDowell's receipt of the initial $5,000 of the $10,000 payment; Lazaro passed the $5,000 to McDowell, who gave Lazaro $100 out of the proceeds. The two also discussed at length the best way to have the charges against Lombardo dismissed with minimum risk to themselves. They decided that McDowell should omit from the police report certain references that were detrimental to Lombardo.

On the evening of July 28, 1981, McDowell and Lazaro again met at the Surf Club. McDowell recorded their conversation, in which he stated that he had made a "good report," leaving "a lot of gray area about whether or not I was sure that the guy I grabbed was the guy that squirted me."

On the following night, July 29, 1981, McDowell met with Lazaro and Barcellona, and again recorded their conversation. McDowell showed the others the revised police report and they compared it with the original version. McDowell explained that he had made a copy of his original report before shredding it. Barcellona was impressed with the altered report and urged McDowell to lend it to him so that he could show it to others.

On August 16, 1981, Lazaro's superiors in the State Police confronted him with the evidence of his misconduct supplied by McDowell. Lazaro then confessed his wrongdoing and agreed to assist the State's investigation.

On August 19, 1981, respondent and Rigolosi met Barcellona for lunch at Barcellona's restaurant in Clifton. Barcellona was later recorded on tape stating that the three men had talked about "the line-up and everything." At Rigolosi's request, respondent returned that evening to an office above the restau-

rant to meet with Lazaro, Rigolosi and Barcellona. Lazaro recorded their conversation.

During the August 19 meeting in Barcellona's office in Clifton, Barcellona noted that respondent was informed during lunch that day about the suggested line-up ploy. Respondent stated that McDowell would "look bad" if he failed to identify an individual that he had arrested. He also mentioned problems that he had discussed with Rigolosi earlier in the day with regard to seeking a line-up.

Initially, Rigolosi also disapproved of the plan to hold a line-up at which McDowell would be unable to make a positive identification of Lombardo. Rigolosi noted that McDowell had already made complaints against Lombardo and that McDowell "can't look like a total horse's ass." He warned against causing "any further investigation beyond the investigation." Rigolosi stated that McDowell's ability to identify someone in a line-up would have to be consistent with the events of July 19:

> I mean you certainly don't want anyone to get suspicious now how can this guy now say he doesn't recognize him, and that night, he signed a complaint against the guy.
>
> Ya, know he caused complaints against this guy to be signed, he knew that night. And he's not a layman; he's a police officer, who ah, made a determination on the night of the event that this guy committed these acts. Now he's sayin' I don't even rec ... I don't even know who it is. Or I don't recognize him, is what he's really saying. So it might cause someone and one thing ya don't want is someone to say to him afterwards, hey listen you're getting cute? What ah, what's happening here? You don't want to cause any further investigation beyond the investigation; however, it is possible that he may really because of the way things happened that night, not be in a position to know, ah look I don't remember what the guy looked like. Ah, I'm not too sure, there were a lot of people around, the mace, the darkness, whatever. But I would think that if that is so, or if it can be thought of as being so by whoever hears it, that the better way to do it is for him to tell the prosecutor, the assistant prosecutor, that instead of going through the formality of a line up where, ah, it just may cause something beyond that to happen again.

Lazaro then asked respondent if he possessed a copy of the revised arrest report or had seen the original report. Respondent replied that he "never saw either one." Shortly thereafter, Lazaro explained to respondent: "There's no case num-

ber on the [report], the [report] just lays around. And that's what gave [McDowell] the opportunity to withdraw the [report] and change it." Lazaro told the attorneys that McDowell "skipped out on everything" in the second or altered report.

After listening to this discussion, respondent stated that he could claim Lombardo was innocent if there was a line-up. He requested to see the arrest report in order to ascertain whether any facts contained therein would create a problem. Lazaro obtained a copy of the altered report from his car and handed it to Rigolosi. Barcellona stated that "the other report was two pages," and added: "This is one page, you're gonna laugh, compared to what it said, and I'm telling you it said about the families." As Rigolosi read the report aloud, Lazaro and Barcellona interjected comments indicating where changes or omissions had been made. At the conclusion of the reading, respondent stated to Rigolosi, "Alright, we're in good shape."

When Lazaro said that he wanted assurance that no copies of the original report—which had been borrowed by Barcellona—were made, respondent acknowledged that he had such assurance "because the guy who I have implicit trust in, who I met early this morning ... [would not] let me see a copy of it" because he "had to give it back" to Barcellona. In response to Lazaro's inquiry, Barcellona identified Grecco as the individual to whom respondent had referred. Before the meeting ended, respondent stated that he would call the prosecutor and assert that Lombardo was mistakenly arrested.

Immediately following the meeting in Barcellona's office, the parties moved downstairs to have dinner. Afterwards, Lazaro drove Rigolosi back to Rigolosi's office building in Hackensack. Their conversation was also recorded by Lazaro. This conversation clearly demonstrates that Rigolosi was told by Lazaro and understood that McDowell had received a $5,000 bribe for his services in the Lombardo matter. After he was so informed, the following colloquy took place between Rigolosi (denoted as VR) and Lazaro (denoted as JL):

VR  Was that handled clean enough, that ah, you know?

JL  The money change?

VR  Huh?

JL  The money change?

VR  Yeah.

JL  You mean the transfer of money?

VR  Yeah.

JL  As clean as possible. Because it went from, ah, Al to my Uncle Sammy, who just gave me the money.

VR  Yeah.

JL  And then I just brought it up to Denis and handed it directly to him. They promised him another five, after, once the thing goes, ah, ya know.

VR  Yeah, yeah. Well, ah this, this thing ought to, ah, you know, it oughta work out well, ah, if, I mean you know the guy. I don't know him. I don't want to meet him. I don't want to see him. And you know the only relationship with McDowell is because you know him and . . .

JL  Well you know, McDowell knows nothing of anything.

VR  Yeah.

JL  That transpires ya know. I tell him a bullshit story as far as what happened, he don't know my uncle is involving or anything like that.

VR  He don't know that?

JL  No.

VR  He never heard my name?

JL  No never heard your name, no way, no way.

VR  He never heard my name.

JL  No, no I just—

VR  Ya see, the reason, the only reason, the only reason, if it was any other lawyer, I don't know anything. Yea, I know Joe Barcellona, bye, bye, you know. You want to talk, Don I'm close to, I also know that, ah, when he told me who it was, he came up to see me that morning, that Monday morning after this thing happened. (Inaudible) stopped at Joey. When he told me it was Lombardo I said, ah shit, ya know and ah . . .

On September 2, 1981, Lazaro telephoned Rigolosi at his office and recorded the conversation. Respondent was in Rigolosi's office and participated in this discussion. Rigolosi mentioned to Lazaro that "several options * * * are open" for a disposition favorable to Lombardo, and told Lazaro that respondent "feels good about it," and "he [respondent] thinks everything will be alright." He also wished Lazaro an enjoyable trip to Florida.

Armed with the altered report and McDowell's apparent willingness to lie about his ability to make an adequate identification, respondent proceeded to fix the case. Respondent met with an Ocean County Assistant Prosecutor on August 28, 1981, for the purpose of dismissing the Lombardo case. The Assistant Prosecutor proposed that a plea to simple assault be made. This offer was rejected by respondent, who stated that his client would rely on the defense of mistaken identity. On October 19, 1981, respondent was informed by an Ocean County Assistant Prosecutor that the Lombardo case would be dismissed because McDowell could not positively identify Lombardo. Two days later, the bribe was completed. Barcellona gave Lazaro an envelope containing $5,000 to be delivered to McDowell. Barcellona told Lazaro that Grecco had given him the money.

Respondent, Vincent Rigolosi, Joseph Barcellona, Alan Grecco, and Samuel Lazzara were indicted by a State Grand Jury on April 16, 1982. Respondent was charged with conspiracy, tampering with a witness, tampering with public records, tampering with physical evidence, promotion of official misconduct, attempt to promote official misconduct, and bribery. After a jury trial, respondent was found guilty of conspiracy and witness tampering. On March 22, 1983, respondent was given a suspended four-year state prison sentence without probation and fined $2,500.

## III.

The facts in this case amply confirm respondent's guilt otherwise evidenced by the criminal convictions. They demonstrate clearly and convincingly that respondent's criminal acts, as breaches of ethics, were particularly egregious and shocking. Respondent participated in a carefully-contrived plot, the sole objective of which was to abort the criminal prosecution of respondent's client, Lombardo. The plot involved a criminal conspiracy among several persons who devised a scheme to

neutralize or eliminate evidence that was crucial to the prosecution's case. This evidence consisted of McDowell's identification of Lombardo as the person who actually assaulted him. Several means were utilized to eliminate this identification evidence. First, the police report that contained information identifying Lombardo as the offender was altered so that the reported information appeared weak, insubstantial and suspect. Second, McDowell was prepared to lie about his ability to identify Lombardo as the offender. The plot also involved a bribe of McDowell, the arresting police officer, who was to be paid ten thousand dollars for his role in getting the charges against Lombardo dismissed.[2]

In accordance with these facts, respondent was convicted of the crimes of conspiracy and tampering with a witness. These convictions conclusively establish that respondent was an active co-conspirator and actual participant in the criminal scheme to use the falsified police report and to have the arresting police officer give false testimony with respect to the identification of respondent's client. In addition, respondent personally made a false representation—he lied—to the Ocean County Prosecutor's Office that the witness, the arresting officer McDowell, could not identify Lombardo as the actual offender.

As a result of respondent's obviously criminal and unethical actions, the conspiracy succeeded; the prosecution against respondent's client was dismissed. We conclude that no discipline short of disbarment can redress the public injury inflicted by respondent's misdeeds.

Certain types of ethical violations are, by their very nature, so patently offensive to the elementary standards of a lawyer's professional duty that they *per se* warrant disbarment. Ethics offenses of this caliber stigmatize a lawyer as unfit to practice.

---

[2]Respondent claims that he was not involved in the bribery of McDowell. He was acquitted of the bribery charge.

■ A prime example of such an ethics offense is the misuse of a client's money. *See, e.g., Matter of Wilson,* 81 *N.J.* 451 (1979). This ethical transgression bespeaks irremediable dishonesty and untrustworthiness and, by itself, is determinative of the attorney's unfitness to practice law. *Id.* The combination of these professional and personal deficits—dishonesty and untrustworthiness—in a lawyer is intolerable. These traits are insufferable because they demonstrate conclusively that the attorney lacks basic rectitude and strength of character. An attorney without the moral fiber to behave with integrity toward his or her own clients cannot be trusted as a lawyer. No confidence can be reposed in such an attorney ever to serve clients with unswerving and singular loyalty. For these reasons, even the attorney's subjective good faith belief that no actual, substantial or lasting harm is being done the client is unavailing; this kind of ethics failing—using a client's money for the attorney's own purposes—merits disbarment.

The present case presents a compelling parallel. It is known and accepted by every attorney that he or she owes continuing and constant fidelity to the administration of justice. Lawyers have "a professional commitment to the judicial process and the administration of justice." *See Application of Matthews,* 94 *N.J.* 59, 77 (1983). In every sense an attorney is an officer of the court, *Matter of Johnson, supra,* 102 *N.J.* 504, required to serve "the administration of justice honorably and responsibly." *Application of Matthews, supra,* 94 *N.J.* at 77. This commitment is heightened in the context of the administration of criminal justice, in which the public welfare is most profoundly implicated. *See Matter of Hinds,* 90 *N.J.* 604 (1982).

■ The attorney's allegiance to his client is no stronger than his commitment to preserving the integrity of the administration of justice. Indeed, an attorney's loyalty to a client can never override the professional loyalty owed to the justice system. *Matter of Johnson, supra,* 102 *N.J.* at 511; *Matter of*

*Silber,* 100 *N.J.* 517 (1985); *Matter of Turner,* 83 *N.J.* 536 (1980).

In the recent case, *Matter of Verdiramo,* 96 *N.J.* 183 (1984), the Court ruled that the crime of attempting to influence the testimony of a federal grand jury witness constituted "grave misconduct that goes to the heart of the administration of justice." *Id.* at 185. The Court analogized this ethical violation, involving the subversion of criminal justice, to the misappropriation of client funds by an attorney, stating:

> Professional misconduct that takes deadly aim at the public-at-large is as grave as the misconduct that victimizes a lawyer's individual clients. Because such a transgression directly subverts and corrupts the administration of justice, it must be ranked among the most egregious of ethical violations. *Id.* at 186.

The subversion of the criminal justice system which took place in this case is comparable to the betrayal of justice that occurs when a judge accepts a bribe and does not sentence a defendant according to law, *see Matter of Coruzzi, supra,* 98 *N.J.* 77, or when a lawyer bribes a public official to prevent the performance of a public duty. *See Matter of Tuso,* 104 *N.J.* 59 (1986); *Matter of Hughes, supra,* 90 *N.J.* 32. Misconduct of this stripe conclusively renders the wrongdoer unworthy of the profession.

█ In this case, the ethical violations constitute a stark breach of professional fealty to the administration of justice. Respondent's misconduct equals in gravity the disloyalty to a client that is exemplified by an attorney's misuse or misappropriation of a client's funds. Consequently, disbarment is mandated. As aptly observed in *Verdiramo, supra,* 96 *N.J.* at 186, disbarment is appropriate for "ethical misconduct of this kind—involving the commission of crimes that directly posion the well of justice."

We consider this kind of ethics violation—the purposeful, knowing and corrupt subversion of a criminal prosecution—to be *per se* evidence of professional unfitness. An attorney who engages in such conduct can never be trusted with the responsi-

bilities of being a lawyer. Consequently, mitigating factors in this case cannot overcome the enormity of respondent's transgressions. We take note, as did the DRB, of the fact that this is the first disciplinary proceeding against respondent, who has been a member of the Bar for 25 years. Respondent has well served his community and his profession, and enjoys the esteem of many members of the profession. These factors would undoubtedly be relevant in a disciplinary proceeding that did not involve the purposeful subversion of the administration of criminal justice. However, in this case, mitigating considerations cannot serve to condone or exonerate, they serve only to make respondent's disbarment a personal tragedy.

For these reasons, any analogy to the cases of *Matter of Weinroth,* 100 *N.J.* 343 (1985) and *Matter of Templeton,* 99 *N.J.* 365 (1985), cited for the proposition that respondent can be rehabilitated and eventually resume a place in the profession, is inapt. In the case of an ethics violation consisting of the perversion of justice, the prospect of rehabilitation is, and will always remain, speculative. Society cannot be expected to become a stakeholder in the rehabilitation of an attorney who has demonstrated such a profound defect of professional character. *See Matter of Wilson, supra,* 81 *N.J.* 451. Instead, society is entitled to know, by the discipline imposed, that the offending party, as well as other attorneys, will be effectively prevented from contemplating or embarking upon a similar dishonorable course. Protection of the public demands disbarment.

The dissent argues that it is inappropriate to disbar respondent since his conduct occurred prior to our decision in *Matter of Verdiramo, supra,* 96 *N.J.* 183. *Post* at 184. It is certainly true that we have not always acted with such certainty, clarity or finality in cases of this kind. However, respondent cannot sincerely claim unfair treatment. Even prior to our opinion in *Verdiramo,* decisions such as *Matter of Rosen, supra,* 88 *N.J.* 1, and *Matter of Sears,* 71 *N.J.* 175 (1976), sent out a clear message to lawyers as to the Court's

perception of the gravity of this kind of offense. It is disingenuous to suggest that prior cases have generated fixed expectations as to the disciplinary consequences that will attach to such misconduct. In *Verdiramo, supra,* 96 *N.J.* 183, the Court did not disbar, concluding that the more than eight years suspension served by respondent would suffice as discipline since "[d]isbarment now would be more vindictive than just." *Id.* at 187. These circumstances are not present in this case. What respondent did amounts to a primer for case-fixing, one of the most serious offenses any lawyer can perpetrate. In this case, the extent of the deviousness involved in "poisoning the well of justice" is too glaring to be excused. Moreover, as noted by the DRB, respondent was an experienced criminal trial attorney, and well understood the consequences of his actions. Respondent's background and experience dispel totally any claim that he was naive, gullible, inexperienced, unlearned, or obtuse. Respondent was under no misapprehension that what he did was dishonest and corrupt. He cannot be excused or treated lightly because he thought, even for a moment, that his misconduct would not deservedly place him in dire professional peril. Such can never be a reasonable expectation in this kind of a case.

For the reasons stated, we order the disbarment of respondent. He shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

O'HERN, J., dissenting.

The sanction imposed by the majority of the Court is inappropriate.

In *In re Verdiramo*, 96 *N.J.* 183, 186 (1984), we noted that previously there had not been a uniform approach to discipline in cases that involve criminal acts of dishonesty that directly undermine the administration of justice. Therefore, although such misconduct "involving the commission of crimes that poison the well of justice is deserving of severe sanctions and would ordinarily require disbarment," we did not disbar Mr. Verdiramo. *Ibid.* Likewise, in *In re*

*Kushner*, 101 *N.J.* 397 (1985), we did not disbar Mr. Kushner for his misconduct, which, though similar to that of Mr. Verdiramo, antedated our decision in *Verdiramo.* [*In re Perez*, 104 *N.J.* 316, 326 n. 4 (1986).]

An evenhanded application of those principles calls for a lesser discipline than disbarment under the facts of this disciplinary.

Our general principle with respect to attorney discipline involving criminal conduct is that the judgment of conviction conclusively establishes guilt. *R.* 1:20–6(b)(1). We look, however, to the underlying circumstances to determine the appropriate penalty to be imposed. *R.* 1:20–6(b)(2)(ii). In this case, the circumstances do not unerringly point to a conclusion that Conway has utterly "unsalvageable professional character," or is utterly "beyond the pale of professional rehabilitation," the traits that call for disbarment. *In re Templeton*, 99 *N.J.* 365, 376, 377 (1985).

There were eight counts to the indictment that led to Conway's conviction. The first count was for conspiracy. The seven substantive counts related to alteration of official records, to tampering with a witness, and to bribery. Conway was convicted only of the conspiracy count and of count number five, tampering with a witness. At sentencing, the court merged the conspiracy with the tampering charge. As a result, we are left with a judgment of conviction that establishes that the conspiracy had no further purposes than the substantive offense of tampering.[1] *State v. Hardison*, 99 *N.J.* 379 (1985).

---

[1]Tampering is a crime of the third degree defined as follows:

*N.J.S.A.* 2C:28–5.

    a. *Tampering.* A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted, he knowingly attempts to induce or otherwise cause a witness or informant to:

    (1) Testify or inform falsely;

    (2) Withhold any testimony, information, document or thing;

    (3) Elude legal process summoning him to testify or supply evidence; or

    (4) Absent himself from any proceeding or investigation to which he has been legally summoned.

        \*   \*   \*   \*   \*   \*   \*   \*

Moreover, since Conway was acquitted of the bribery and the conspiracy to commit bribery charges, the verdict establishes that he was innocent of complicity in or knowledge of the bribery of any party to the transaction. Tampering was his sole offense.

The evidence most damaging to the position that Conway is not without redeeming character is that Conway was present at the meeting of August 19, 1981, when the altered report was discussed. As far as he was informed, the officer's official report had never been submitted. This was the meeting to which Lazaro was sent by his superiors to try to find out if the lawyers were involved. Lazaro had explained to his superiors that Conway knew nothing of the bribe. Despite McDowell's prodding, Lazaro had previously told McDowell that the bribe scheme was going to be limited to three people—Sergeant Lazaro, McDowell, and Al Grecco. Sergeant Lazaro stated, "You see, it's better that way." When Sergeant Lazaro went to the August 19, 1981 meeting, Conway would have had to suspect that a superior officer of the State Police, indeed an instructor at the police academy, was "in on a fix" in order to conclude that a bribery scheme was being discussed. Moreover, the evidence that Conway had obtained from his client was contrary to the assertion that the client had sprayed tear gas in the face of Officer McDowell. At the time of trial, witnesses from the scene corroborated Conway's client's version of the incident, i.e., that he had not sprayed tear gas in the face of McDowell.

An Ocean County assistant prosecutor described the case as a "garden-variety-Saturday-night-bar-emptying * * * incident." Conway was thus presented with an off-duty state trooper who merely appeared anxious to dispose of a case in order to avoid being involved in a moonlighting investigation, and who might have been stating the truth in the second report. Consequently, Conway contends that the meeting of August 19, 1981, when the report was discussed, was merely an effort on the part of the state police officer to dispose of a case that had a potential

of dangerous repercussions for the official. McDowell had described it as a "soft report."

There are two pieces of uncontroverted evidence that suggest Conway's limited role:

(1) During the lull in this matter between the incident on July 19, 1981, and the meeting of August 19, 1981, Conway had been away on a family vacation in New England.[2] On his first day back in the office, August 17, 1981, Conway spoke with the Ocean County Prosecutor's office to renew the request for the preliminary hearing that he had first requested on the very day that he interviewed his client, the Monday after the incident. If Conway had been a party to the bribe, it seems likely that he would have waited to hear from the corrupt officials as to how they planned to dispose of the case before requesting the hearing.

(2) The state police officials in charge of the investigation did not believe they had evidence of corruption involving the attorneys. Lieutenant Buccino, the official in charge of the investigation, candidly stated that he sent Sergeant Lazaro, who had been confronted with his complicity in the bribe and had agreed to work as an undercover agent, to the meeting on August 19, 1981, specifically to determine if the attorneys were involved. Conway and Rigolosi were both puzzled as to why Lazaro wanted to see them. But it was not unnatural that they agreed to attend the meeting with Lazaro and Barcellona on Wednesday, August 19, 1981, since it concerned potential lawsuits involving both their clients. Recall also that Sergeant Lazaro and Barcellona were cousins and Rigolosi and Lazaro were boyhood friends. The case against the lawyers stands or falls on the events of that night.

---

[2]As noted in the majority opinion, the corrupt agreement between Sergeant Lazaro and Trooper McDowell was entered on July 24, 1981. Lazaro was confronted by his superiors on August 16, 1981. He had been permitted to go to Florida before being confronted with his involvement in the bribery scheme.

After hearing all the evidence, the jury acquitted Conway of bribery of a public official. He was convicted only of knowing about and cooperating in the changing of an official report. As an abettor, even if he had no part in the alteration, he is liable as a principal. But Conway still argues that he believed that his client was innocent and that the arresting officer's second report correctly stated the facts. This was an extraordinarily complex trial involving bribery charges implicating the members of organized crime who had passed the money from the Lombardo family through Grecco (also known as Wolshonak) to Sam Lazzara [3] (Sergeant Lazaro's uncle), then to Lazaro, and then to McDowell.

These crime figures sought to achieve their ends via two routes: (1) the organized crime families were attempting to bribe a state trooper; [4] and (2) the discussions were being conducted with Conway and Rigolosi concerning disposition of the case. So uncertain were the State Police of the role of the lawyers that before the probable cause hearing concerning the complaint signed by McDowell against Lombardo, they had Sergeant Lazaro call Rigolosi to find out what action he and Conway would be taking with respect to the case. Conway, however, refused to be involved with Lazaro. Ironically, the State dismissed the case on its own motion when Conway took no overt step to further a conspiracy other than to persist in his original request for a preliminary hearing. He never would participate in the lineup that Sergeant Lazaro was suggesting.

---

[3]Sam Lazzara was acquitted on all charges.

[4]This corrupt scheme was further complicated by the fact that several parties had multiple "axes to grind." Barcellona wanted revenge against the Lombardo family for a prior slight involving the elimination of someone who owed Barcellona money; Sergeant Lazaro wanted to "squeeze" some extra money for McDowell so that McDowell could repay the money that Barcellona had loaned him (at Sergeant Lazaro's request) to buy a home; McDowell wanted to find a way out of the problems that would surface when his "moonlighting" for Barcellona came out.

There are two other pieces of evidence in mitigation that must be considered: (1) the statement by Grecco, the bribe-carrier, when he was being secretly taped by Sergeant Lazaro, that he, Grecco, did not know Conway, had never met him, and had not spoken to Conway about this matter, and (2) a statement apparently made by Barcellona to the state investigating authorities, after Barcellona was confronted with his involvement in the bribery scheme and was asked to cooperate in further investigation of the lawyers but declined to do so, to the effect that, "they didn't know anything about it." [5]

I may misread this record, but in light of all the circumstances, the jury's acquittal of the bribery counts, the uncertainty of the state police over the lawyers' roles, the secretly-taped statement of Grecco that he never spoke to Conway, and the statement by Barcellona that the lawyers did not know about the bribe, I am not left with an abiding certainty that Conway has demonstrated that defect in character that we have found essential to disbarment of attorneys.

In *In re Friedland*, 95 *N.J.* 167 (1984), the Court recently had occasion to consider the comparative significance of ethical violations. In that case, quoting the report of the Disciplinary Review Board (DRB), we noted:

> The respondent stands convicted of conspiracy and soliciting kickbacks for significant gain to the financial detriment of his client, the Pension Fund. This alone merits disbarment. [*Id.* at 168.]

The DRB made reference to a related conviction of attempting to influence a grand juror as further compelling the "inescapable [conclusion] that disbarment is mandated." *Ibid.* Hence, prior to *In re Verdiramo, supra,* 96 *N.J.* 183, it did not appear that disbarment was invariably mandated when there was only the attempt to influence a witness' testimony. Furthermore, the inconsistency of the court's principles is even more stark in this case because the single most damaging piece of evidence in

---

[5]This statement was excluded as hearsay in the criminal trial but nevertheless may be relevant to our determination of the appropriate sanction.

the case, the taped conversation between Sergeant Lazaro and Rigolosi, was out of Conway's presence.

My own journey to this decision is different from that of the other members of the Court. I dissented in *In re Hughes,* 90 *N.J.* 32 (1982), when the Court disbarred an attorney who, in an effort to save his family from shame and disgrace, regrettably became involved in an attempt to influence a federal official to overlook the alteration of a tax lien. Following the majority's determination in *In re Hughes* that disbarment was mandated, I dissented in *In re Infinito,* 94 *N.J.* 50 (1983), in which the Court permitted an attorney to remain in practice despite a conviction of stealing in a supervisory setting. I determined then that I could not continue to draw the lines of moral quality that the Court thought it could.

I rejoined the majority in *In re Verdiramo, supra,* because I believed the Court had stated a new principle of law, applicable to cases arising after that date, that crimes of dishonesty touching upon the administration of justice will almost invariably warrant disbarment. 96 *N.J.* at 186. Application of that principle was unanimously followed in *In re Kushner,* 101 *N.J.* 397 (1986), in which we did not apply *In re Verdiramo* retroactively, and therefore permitted Kushner to remain in practice.

Consistent with my own principles, I believe that prior to our decision in *In re Verdiramo,* a conviction of this type did not invariably result in disbarment. *See In re Rosen,* 88 *N.J.* 1 (1981) (attorney convicted of attempted subornation of perjury suspended for three years); *In re Mirabelli,* 79 *N.J.* 597 (1979) (attorney who pled guilty to a charge of bribery given three-year suspension). For example, *In re Kushner, supra,* 101 *N.J.* 397, involved a crime of dishonesty touching upon the civil administration of justice; *In re Verdiramo, supra,* 96 *N.J.* 183, involved a crime of dishonesty touching upon the administration of criminal justice. In neither case was the attorney disbarred. Had this case arisen after announcement of the rule in *In re Verdiramo,* that a crime of dishonesty touching upon the

administration of justice will almost invariably warrant disbarment, I would disbar. I continue, however, to hold the belief that we should adhere to the principle announced in that decision not to apply the rule retroactively. *See In re Perez, supra*, 104 *N.J.* at 326.

I think it is unfair to condemn Conway because the parties involved in the bribe were also involved in organized crime. Of course, if Conway had been convicted of conspiracy to bribe, not just tampering, the case would be closed. *In re Tuso*, 104 *N.J.* 59 (1986). I know that it is difficult to separate this conviction from the overarching organized-crime activity to which it is related. However, the jury acquitted Conway of involvement in that organized criminal conspiracy to subvert justice. I would afford him the same treatment as accorded other attorneys for conduct that occurred prior to the decision in *In re Verdiramo*, and therefore respectfully dissent.

*For disbarment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK and GARIBALDI—4.

*Dissenting*—Justice O'HERN—1.

## ORDER

It is ORDERED that DONALD R. CONWAY of HACKENSACK, who was admitted to the bar of this State in 1960, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that DONALD R. CONWAY be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.