IN THE MATTER OF EDWARD BRADY, AN
ATTORNEY AT LAW.

Argued February 2, 1988—Decided May 6, 1988.

218

Robyn M. Hill, Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

Richard E. Brennan argued the cause for respondent (Shanley & Fischer, attorneys; Richard E. Brennan, Raymond M. Tierney, Jr., and Lonna R. Hooks, on the brief).

PER CURIAM.

This disciplinary proceeding arises out of two presentments filed by the District IV Ethics Committee for Camden and Gloucester Counties (the Ethics Committee), which concluded in each matter that respondent had committed unethical conduct. The Disciplinary Review Board (DRB) agreed with the Ethics Committee's finding of unethical conduct, and unanimously recommended that respondent be publicly reprimanded. Our independent review of the record leads us to the conclusion that respondent has been guilty of unethical conduct in the matters charged. However, we think that a three months suspension from the practice of law more appropriately reflects the seriousness of respondent's conduct.

I

Respondent was admitted to the bar in 1951. The presentments stem from two separate transactions.

A. *The Humphrey Matter*

On October 19, 1982, Lloyd Humphrey retained the respondent on a contingency fee basis to handle all claims for injuries

that Humphrey sustained in a fall from the roof of his brother's house. Three days later, on October 22, 1982, Humphrey sent a mailgram to respondent to "cancel" their agreement. On that same date, Humphrey sent respondent a letter confirming he would "like to cancel" their agreement for respondent to represent him.

Shortly thereafter, notwithstanding Humphrey's termination letter, respondent telephoned Humphrey several times and urged him to continue the legal action, suggesting that the insurance company would not settle if Humphrey were not represented in his claim. Respondent also forwarded several letters to various persons including doctors and a hospital in preparation of the case.

By letter dated April 18, 1983, Humphrey advised respondent he did not "currently wish" to have respondent represent him, adding that should he find the insurance company totally uncooperative in settling the matter, he would then use respondent's services. By letter dated April 29, 1983, respondent replied he had already filed the lawsuit. At the ethics proceedings, respondent produced a copy of a letter dated April 12, 1983, to the Clerk of the Superior Court in Trenton in which he filed the legal action on behalf of Humphrey. A copy of the first page of the complaint marked into evidence at the ethics proceedings reflected a filing date of April 22, 1983.

When Humphrey received respondent's letter, he telephoned respondent and told him he did not want a lawsuit filed. Respondent replied that if he attempted to withdraw the legal action at that time, Humphrey would incur expenses and would not receive anything from the insurance company. Humphrey then instructed respondent to do what he could to settle the matter immediately.

On August 30, 1983, Humphrey wrote respondent, stating that his family did not agree with his approach in resolving this matter and instructed respondent "to do whatever is necessary to resolve and settle this case immediately." This letter was

followed by a mailgram dated September 1, 1983, in which Humphrey directed respondent "to settle this case within the week or drop it completely."

Respondent answered by letter dated September 8, 1983. He informed Humphrey that he was awaiting a medical report before he could proceed further with the case. On October 11, 1983, respondent received the medical report in which the doctor found that Humphrey would experience some disability, including pain and a limitation of functioning.

Two days later, on October 13, 1983, Humphrey sent respondent a letter, which stated in part:

Effective with the date of this letter, please be advised that your services are no longer required and are terminated. Your authority is null and void.

Respondent was further directed by Humphrey to transfer all his files to a Patrick Shannon, Esq., Humphrey's new attorney. Nonetheless, on October 17, 1983, respondent accepted the insurance company's offer of $5,000 in full settlement of the case. He immediately wrote Humphrey informing him of the settlement. In that letter he acknowledged Humphrey's October 13, 1983, letter merely by stating that he had received it. On October 20, 1983, without waiting for further communication from his former client, respondent wrote to the insurance company, requesting a release.

On October 17, 1983, Patrick Shannon, Esq., Humphrey's new attorney, wrote respondent, informing him that he had been retained by Humphrey. Four days later he wrote a similar letter to the insurance company.

On October 25, 1983, before the insurance company became aware of the presence of a second counsel, it forwarded a release form and Stipulation of Dismissal to respondent.

This flurry of correspondence caused confusion, and on October 28, 1983, the attorney for the insurance company wrote to Mr. Shannon:

Both you and Mr. Brady have confirmed that this case is settled for $5,000. Under these circumstances, I am confused as to who is representing Mr.

Humphrey, at this point. I would appreciate your advice concerning this matter.

On that same day, respondent wrote to Mr. Shannon stating that he was entitled to "more than my expenses. I settled the case for $5,000." On November 1, 1983, Humphrey wrote two letters: one to respondent, claiming dissatisfaction with the settlement and reminding respondent that his services had been terminated as of October 13, 1983, and one to the insurance company informing it that respondent had been terminated and a new attorney had been retained.

Apparently as a result of communications between respondent and Humphrey's new counsel, respondent agreed to forward a substitution of attorney, once he received a check to cover his costs and fee, a total of $2,029.44. He confirmed this agreement by letter dated November 7, 1983.

When the attorney for the insurance company did not receive the completed release forms, he filed a motion to enforce the settlement, returnable on December 16, 1983. The DRB describes respondent's conduct in pursuit of the Humphrey judgment as follows:

Since respondent had planned to be in Vermont on December 16, he prepared a form of judgment which ordered that the $5,000 settlement be paid by the insurance company. Although this company insured the defendants in the civil legal action, it was not a named party in the suit. The judgment provided that a check be issued to respondent for $2,029.44 and the balance of $2,970.56 be paid to plaintiffs. Two days before the return date of the motion, respondent went to a Superior Court judge requesting that he sign the judgment. When the judge testified before the ethics committee, he said respondent had asked him to sign a consent order, which he assumed had been agreed to by all the parties involved. After the judgment was signed, respondent took a copy to the insurance company attorney who did not object to it, because it was in the agreed upon amount and the checks were in the amounts previously agreed to by Humphrey's new attorney. Respondent did not deliver a copy to Humphrey's attorney who only learned of it when he received a telephone call from the insurance company's attorney. Respondent filed the judgment but did not file a warrant to satisfy the judgment after he received the money.

At the ethics proceeding, respondent admitted that he acted for himself in having the judgment signed because he had an outstanding attorney's lien. He said he was interested in being paid. However, he also maintained he was acting not only for himself but for his client. Although he was not sure whom he was representing at the time of the judgment, respondent claimed he was

still attorney of record, since Humphrey's current attorney had not filed a substitution of attorney.

In the Humphrey matter, the DRB found by clear and convincing evidence

> that respondent persisted in his representation, although Humphrey had discharged him as his attorney. While Humphrey may have equivocated at times regarding his desire to retain respondent, it was incumbent upon respondent to determine early whether his client wished to pursue the legal matter. Instead, respondent ignored the desires of his clients and proceeded headlong in what he thought should be done.

> The Board agrees with the ethics committee that respondent's conduct regarding the judgment was "outrageous." Respondent willfully ignored or disregarded the usual motion practice of challenging a proposed court order. Respondent, without authorization of his purported client and without notice to his adversaries, went to a judge and had him sign a judgment which included an order that the insurance carrier, which was not a defendant, pay the settlement amount.

## B. *The Stosny Matter*

### 1. Motion to Dismiss

█ Respondent moved to dismiss the Stosny presentment because the transcript of respondent's testimony before the Ethics Committee is not available. Three hearings were held before the District Ethics Committee on the Stosny matter. Transcripts from two of the hearings, including the testimony of Committee witnesses Joseph Stosny, Jr., Mary Stosny, and Stephen Stosny, were available and have been reviewed by the Ethics Committee, the DRB, and this Court. However, the transcript and the reporter's notes for the third hearing, which consisted solely of respondent's two-hour testimony before the Ethics Committee, cannot be located. Respondent contends the absence of the transcript of his testimony for review by the Ethics Committee, the DRB, and this Court violates his constitutional rights to due process of law under the fourteenth amendment of the United States Constitution and under Article I, paragraph 1 of the New Jersey Constitution.

We disagree and deny respondent's motion to dismiss the Stosny presentment. Respondent appeared personally and tes-

tified before the Ethics Committee. Members of the Ethics Committee therefore had ample opportunity to consider respondent's testimony before concluding that his conduct was unethical.

Proceedings before the DRB and this Court are *de novo* on the full record. *R.* 1:20-4(f)(1). Respondent filed briefs and argued through his counsel before both the DRB and this Court. Respondent makes no claim that anything material would be added by the transcript of his testimony. We find that any minor procedural defect was cured by the fact that respondent was given every opportunity and took full advantage of those opportunities to present his position. Given respondent's presentation of briefs and oral argument before the DRB and this Court, we conclude that the loss of the transcript of respondent's testimony before the Ethics Committee did not deprive him of procedural due process under either the federal or New Jersey Constitutions. Nonetheless in considering the Stosny matter, we have accepted respondent's explanation that his actions in that matter primarily resulted from his concern for Michael Stosny, a minor.

### 2. Facts of Stosny Matter

The evidence in the Stosny matter is supported by much documentary evidence and by the testimony of Mary Stosny, Stephen Stosny, and Joseph Stosny, Jr., all of whom contradict respondent's position.

On July 27, 1983, Mary Stosny, Stephen Stosny, and Joseph Stosny, Jr., met with respondent's associate to discuss the administration of their deceased father's estate. Mr. Stosny had died intestate on July 22, 1983. The attorney was informed that their father had buried $15,000 in the cellar of his house in 1979 to be used for the support of Mary and her minor brother, Michael. After their father died, the money was placed in two bank accounts, in Mary's name only.

After respondent learned of the substance of his associate's conference with the Stosnys, he telephoned the home of Joseph Stosny, Jr. When Mary answered, respondent told her that it was a shame that a young girl such as herself would have to go to jail for taking money that did not belong to her. According to Mary, respondent also told her she needed an attorney and should see him that evening. Mary and Joseph met with respondent that evening, and respondent agreed to represent them and to file an inheritance tax return. Respondent prepared an inheritance tax return that did not include the $15,000. Joseph signed the return on November 17, 1983.

Respondent demanded possession of certain bank certificates in Stephen's possession. In a letter dated March 13, 1984, Stephen informed respondent that there was no reason to forward the certificates. He had been advised by counsel that respondent did not represent the administrator of the estate and since the estate amounted to less than $5,000, no administrator was required. Further, respondent should

> move expeditiously to dispose of the tax waiver forms you've received from Trenton, and not delay this matter anymore than you already have done through errors and unnecessary maneuvers.

By letter dated March 19, 1984, respondent retorted that he resented Stephen's letter and accused him of trying to evade payment of legal services. This prompted a heated exchange of correspondence between the two resulting in Stephen sending respondent a letter containing specific instructions regarding the manner in which he wished the respondent to represent him.

On June 5, 1984, respondent filed a complaint in action for appointment of guardianship and an order to show cause in the matter of Michael Stosny. Joseph was listed as the movant. The court action sought to restrain the next of kin from withdrawing the $15,000 and using the money for any purpose without court permission. Paragraph 7 of the complaint reads as follows:

7. Since Joseph Stosny, Jr., has filed a New Jersey Inheritance Tax Report it has come to his attention that Mary Stosny deposited the sum of approximately $15,000.00 in her own accounts in Anchor Savings Bank, Cherry Hill, New Jersey and the Fidelity Bank and Trust Company, Pennsauken, New Jersey in a certificate. This money, Joseph Stosny understands, was given by decedent to Mary Stosny before his death to use for the benefit of the minor Michael Stosny.

Six days before the return date of July 26, 1984, Joseph wrote to the court stating he did not wish to be plaintiff in the court action. He explained:

I had instructed my attorney, Edward J. Brady not to file the pleading in the first place, and have subsequently instructed him to withdraw it.

Moreover, he did not contend, as the pleadings stated, that the $15,000 had been a gift from his father before death for the benefit of Michael Stosny. Rather, the money was a gift to be used by both Mary and Michael. Finally, since his sister had agreed to give half of the money to the surrogate in trust for Michael, there was no reason for this matter to be before the court.

An attorney appeared on respondent's behalf at the July 26, 1984, court hearing. That attorney later reported to respondent that Mary acknowledged that half of the $15,000 belonged to her younger brother, Michael. The attorney said that all parties acknowledged that Michael was entitled to his share of the accounts. He stated that the court directed that all of Michael's assets be turned over to another attorney designated by the court as guardian for the minor.

By letter dated August 31, 1984, respondent filed a Notice of Motion along with an affidavit from Joseph in the Matter of the Guardianship of Michael Stosny in support of a judgment in which he sought, among thirteen other things, payment of certain expenses to Joseph, an accounting, and orders compelling his own clients, Mary and Stephen, to turn over certain funds to the guardian. The legal action was filed on behalf of Joseph who in his affidavit sought from Michael's guardian reimbursement of expenses in the amount of only $1,719.87. The three-paragraph affidavit does not address any of the other

forms of relief sought by respondent in the Notice of Motion. At the hearing, September 21, 1984, the court disallowed the claim for reimbursement to Joseph because it had not been made in accordance with Court Rules. The court denied the balance of the request for relief but ordered that any papers pertaining to the estate be turned over to the attorney for the estate. The court further directed that any money Joseph earned on Michael's money be turned over to his guardian. The Ethics Committee found, based on incorporated sound recordings of the September 21, 1984, hearing, that respondent conducted himself in a manner inappropriate in a judicial proceeding, namely, that he had been rude and abrasive to the judge and the attorneys who participated at the hearing.

By letter dated December 14, 1984, respondent sought to block a savings and loan association from releasing funds to Stephen, claiming that Joseph was a joint owner of that account and that Stephen owed Joseph money. Respondent stated in that letter that he was former counsel to Joseph Stosny. Respondent also sought to place a lien against Mary's account, claiming that Joseph had a lien because of outstanding funeral bills, hospital bills, and attorney's fees.

In the Stosny matter, the DRB found by clear and convincing evidence that

[r]espondent's pattern of misconduct becomes more apparent. Respondent continued his multiple representation of Joseph, Stephen and Mary Stosny when his professional judgment on behalf of Stephen and Mary Stosny was adversely affected by his representation of Joseph Stosny. His actions violated *DR* 5–105(B). Respondent filed a complaint on behalf of Joseph Stosny, although he had been directed by Joseph not to do so. In that legal action, respondent sought to compel his own clients, Mary and Stephen Stosny, to turn over certain money to the county surrogate. He also sought to create a lien on accounts of Mary and Stephen Stosny. His conduct was contrary to *DR* 7–101(A)(3). Respondent also far exceeded the direction of his client, Joseph Stosny, who only sought reimbursement of expenses, when he sought various other items of relief in that legal action, contrary to *DR* 2–110(B). When assessed in its totality, respondent's conduct evinces a cavalier insensitivity to the needs of his clients and reflects adversely on his fitness to practice law, contrary to *DR* 1–102(A)(6).

## II

■ Our independent review of the record confirms by clear and convincing evidence that respondent is guilty of unethical conduct. In both matters respondent showed an insensitivity to his clients and to the court. In both cases respondent persisted in representing his clients after he had been specifically discharged, thus violating *DR* 2–110(B)(4),[1] and in both cases respondent took serious actions unauthorized by his client, *i.e.*, in Humphrey, securing the consent order, and in Stosny, filing the complaint against Mary and Stephen.

Moreover, in Stosny, respondent clearly violated *DR* 5–105(B) and *DR* 7–101(A)(3). Respondent continued to represent Joseph, Mary, and Stephen even after he had filed a complaint purportedly on behalf of Joseph, against Stephen and Mary, thus violating *DR* 5–105(B), which bars a lawyer from continuing multiple employment if the exercise of his professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client. By requesting in the complaint that Mary and Stephen turn over certain money to the surrogate, and by attempting to create liens on the bank accounts of both Mary and Stephen, respondent violated *DR* 7–101(A)(3), which bars an attorney from knowingly prejudicing or damaging his client during the course of their professional relationship.

Recently, in *In re Garber*, 95 *N.J.* 597 (1984), we suspended an attorney from the practice of law for a year due to serious conflict of interest charges. In that case the attorney represented the State's main witness in a murder prosecution while maintaining a personal and professional relationship with defendant and defendant's uncle. We stated:

---

[1]Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

> It is patently unethical for a lawyer in a legal proceeding to represent an individual whose interests are adverse to another party whom the lawyer represents in other matters, even if the two representations are not related. *Gray v. Commercial Union Ins., Co.,* 191 *N.J.Super.* 590, 598 (App.Div.1983); *see International Business Machines Corp. v. Levin,* 579 *F.*2d 271 (3d Cir. 1978). A lawyer may not represent the adversary of one of his present clients. *Gray v. Commercial Union Ins. Co., supra,* 191 *N.J.Super.* 590; *see In re Cipriano,* 68 *N.J.* 398 (1975). [*Id.* at 607–08.]

In *Matter of Reiss,* 101 *N.J.* 475, 491 (1986), where we suspended respondent from practice of law for one year for numerous ethical infractions, we stated with respect to conflict of interest that

> [i]t is self-evident that where a member of the bar represents a litigant in a cause, he should not thereafter represent the opposing party in any step in the proceedings in or arising out of the same cause. *See In re Garber,* 95 *N.J.* 597, 607 (1984); *In re Palmieri,* 76 *N.J.* 51, 63 (1978).

*See also In re Cipriano,* 68 *N.J.* 398 (1975), in which we publicly reprimanded an attorney who originally represented a tenant's group and then subsequently represented the landlord. In this case, respondent continued multiple representation of all three clients while representing one client in an action against the other two clients.

Respondent's most egregious conduct, however, occurred in the Humphrey matter when he made an *ex parte* application to a judge for a "consent" order without notice to any of the parties. In securing the "consent order" respondent led the judge to believe that all parties had consented to the judgment. "A lawyer has an obligation of being candid and fair with the Court. As an officer of the court, his duty can be no less." *In re Turner,* 83 *N.J.* 536, 539 (1980). In *Turner,* we held that an attorney representing his client in a receivership action who failed to advise the court of an asset the client received warranted a public reprimand. Likewise, in *Matter of McDonald,* 99 *N.J.* 78 (1985), the court held that an attorney who failed to disclose to the municipal court that the criminal defendant he was prosecuting for issuance of bad checks had made partial restitution on some of the checks warranted a public reprimand. And in *In re Johnson,* 102 *N.J.* 504 (1986), we held that an

attorney's misrepresentation to the civil court in order to secure an adjournment warranted a three-month suspension.

In mitigation of respondent's "outrageous" conduct in respect of the Humphrey "consent order," we recognize that the document submitted to the judge did not contain the written consent of opposing counsel, that the parties had settled the case, that the terms of the settlement including the settlement distribution amounts were correctly stated in the order, that respondent served a copy of the signed order on opposing counsel the same day, and that he called the attorney representing the insurance carrier prior to the filing of the consent order. Nonetheless, respondent is not an inexperienced lawyer. He has been a member of the bar since 1951.

Respondent's actions in both these cases are evidence not of an aberrational incident but of a pattern of operation.[2] Moreover, his conduct at the hearing of September 21, 1984, discloses an extremely belligerent and disrespectful attitude toward the court and the other attorneys.

Based on our independent review of the record, we conclude that respondent's conduct evinces a cavalier insensitivity to the needs of his clients and disrespect to the judiciary. His conduct with respect to the Humphrey "consent order" is sufficient in itself to warrant a suspension. We therefore conclude that respondent should be suspended from the practice of law for three months. He is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

---

[2]While respondent has not been previously sanctioned for disciplinary action, thirty-three ethical complaints have been filed against him between 1964 and 1984.

## ORDER

It is ORDERED that EDWARD J. BRADY of HADDON HEIGHTS, who was admitted to the bar of this State in 1951, be suspended from the practice of law for a period of three months, effective June 1, 1988, and until the further order of this Court; and it is further

ORDERED that EDWARD J. BRADY reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that EDWARD J. BRADY be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that EDWARD J. BRADY comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.