590 A.2d 1124

IN THE MATTER OF HARRY A. DELVENTHAL, JR., AN ATTORNEY AT LAW.

Argued January 29, 1991—Decided May 24, 1991.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Robert W. Delventhal* argued the cause for respondent (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

PER CURIAM.

This disciplinary proceeding arose from a complaint filed against respondent, Harry A. Delventhal, Jr. The District

Ethics Committee (DEC) found that respondent had acted unethically in seeking and obtaining an *ex parte* order dismissing a complaint for failure to answer interrogatories, despite alleged assurances to his adversary that he would await his response, and in using the dismissal order to obtain the release of funds held in escrow in connection with a writ of attachment. The DEC further concluded that respondent had not acted unethically in obtaining a second *ex parte* order of dismissal for failure to answer supplemental interrogatories in the same case. The Disciplinary Review Board (DRB) concluded that the evidence regarding the first *ex parte* application for an order of dismissal was ambiguous, and thus the record did not support a finding of ethical violation for that charge. With respect to respondent's withdrawal of the escrow funds, however, the DRB found that the DEC's findings of professional misconduct were supported by clear and convincing evidence. The DRB also agreed with the DEC that respondent had not acted improperly in obtaining the second order of dismissal.

A majority of the DRB recommended a public reprimand, one member voted for a private reprimand, and one member voted to dismiss the case. Our independent review of the record leads us to agree that respondent engaged in unethical conduct. In our view, however, a three-month suspension from the practice of law more appropriately reflects the seriousness of respondent's misconduct.

I

In February 1988, Wayne Batten signed a contract to sell his house. In April 1988, he hired respondent to represent him in connection with that sale, and to defend him in a breach-of-contract suit involving the renovation of real estate by a construction company in which Batten had been a partner. The grievant, A. Harold Kokes, was a member of the law firm of Loveland, Garrett, Russell & Young (Loveland, Garrett) and was responsible for the firm's representation of the plaintiffs in

the breach-of-contract action. In that action, Kokes had obtained a writ of attachment against Batten's real and personal property that was delaying the closing of title on Batten's house.

After agreeing to a lump-sum-fee arrangement with Batten, respondent moved to vacate the writ of attachment. In May 1988, the court signed an order directing that the closing on Batten's residence take place on the condition that the net proceeds, including $3,500 in legal fees to respondent, be held in an interest-bearing escrow account. The funds were to remain in escrow "until further order of this court," and the plaintiffs' writ of attachment was to otherwise "remain in full force and effect." On the same day, title closed on Batten's house and respondent placed the sum of $19,870.25 in escrow with the Title Company of New Jersey (TiCo). The escrow agreement provided that TiCo was to retain the funds until "receipt of court order directing payment."

In July 1988, respondent again moved to vacate the writ of attachment. The court denied the motion and ordered

that no monies shall be released from the * * * escrow account * * * until further order of this Court only after a duly filed Motion for release of funds for emergent purposes only * * * after Defendant, Wayne Batten, has demonstrated to the Court's satisfaction that he is gainfully employed or after a duly filed Motion by Harry A. Delventhal, Jr., Esquire * * * for release of attorney's fees, *or under further order of this Court.* [Emphasis added.]

In late July 1988, respondent moved for release of certain monies from the escrow account. On July 29, 1988, the court ordered that TiCo make payments totalling $4,703.78, including $3,703.78 to pay two of Batten's debts and $1,000 to be paid to Delventhal. The court specifically ordered that TiCo make those payments "upon presentation * * * of a true copy of this order by Harry A. Delventhal, Jr., Esquire." Those funds were then withdrawn from the account.

In the meantime, respondent continued to represent Batten in the underlying lawsuit. In connection with that litigation, respondent served interrogatories on Kokes on July 7, 1988.

Pursuant to *Rule* 4:17–4(b), the answers were required on or before September 5, 1988. When respondent had not received the answers by September 9th, he wrote to Kokes:

Answers to Interrogatories, service [of] which [was] acknowledged by you on July 7, 1988, are now overdue. Be advised that unless I receive answers within the next five days, I shall be forced to file the appropriate motion.

Kokes received respondent's letter on September 12th and called him the following day to apologize for the late answers. He explained that there was a large volume of documents to compile and that Scott Schwarz, the principal plaintiff in the action, was a pilot who was away frequently during the sixty-day period. Although both Kokes and respondent agree that Kokes then told respondent that the answers would be forthcoming, they sharply disagree about the date on which Kokes promised to serve them. Respondent testified at the DEC hearing that Kokes promised to send them by the end of that week (September 16th). Kokes testified, however, that he told respondent that the "the earliest [he] could get him the answers would be the end of that week [September 16th], but the latest [he] would get them to him would be the following week." In the affidavit that he subsequently submitted with his motion to reinstate the complaint, Kokes specified that he had promised to send the answers by September *16th*, and his file notes concerning the conversation indicated "answers end of week [September 16th] = o.k."

On September 20th, respondent applied *ex parte* for an order dismissing the complaint pursuant to *Rule* 4:23–5(a) on the basis that he had not received the answers that Kokes had promised.[1] On September 22nd, the court signed an order

---

[1]*Rule* 4:23–5(a) then provided:

(a) Dismissal or Suppression. If timely answers to interrogatories are not served and no formal motion for an extension has been made pursuant to R. 4:17–4(b), the complaint, counterclaim or answer of the delinquent party shall be dismissed or stricken by the court upon the filing by the party entitled to the answers of an affidavit stating such failure within 60 days from the date on which said answers became due. Thereafter such

dismissing the plaintiffs' complaint for failure to answer interrogatories. Kokes mailed the interrogatory answers to respondent the next day, September 23rd.

On September 27th, respondent wrote to Kokes, acknowledging receipt of the answers and enclosing a copy of the court's dismissal order. (Kokes testified that respondent did not include a copy of the supporting affidavit, as *Rule* 4:23–5(a) required, until October 31, 1988, after he had requested it from respondent.) In the letter respondent volunteered to sign a consent order vacating the dismissal order and reinstating the complaint. Respondent did not consult with his client before sending that letter.

On receiving respondent's letter, Kokes called him on September 28th or 29th to ask "what was going on." Kokes and respondent agree that respondent reassured Kokes in that conversation by again offering to sign a consent order to vacate the dismissal order. They disagree, however, concerning the content of their discussion about the escrow funds. Kokes testified that he had asked respondent if he planned to use the dismissal order to invade the account, and that respondent had told him that because *Rule* 4:23–5(a) allowed Kokes thirty days in which to reinstate the complaint, respondent could not invade the account during that time period. Respondent testified, on

---

relief may be granted only by motion. The affidavit shall have annexed thereto a form of order of dismissal or suppression. A copy of all such orders with affidavits annexed shall be served upon the delinquent party within 7 days after the date thereof. On formal motion made by the delinquent party within 30 days after service upon him of the order, the court may vacate it, provided fully responsive answers to the propounded interrogatories are presented and the delinquent party pays costs in the amount of $50.00 to the Clerk of the Superior Court. An order of dismissal or suppression shall be entered only in favor of the moving party.

Pursuant to our recommendation in *Aujero v. Cirelli,* 110 *N.J.* 566, 542 *A.*2d 465 (1988), *Rule* 4:23–5(a) has been revised to permit such an application only on notice to one's adversary. See S. Pressler, *Current N.J. Court Rules* 4:23–5(a) comment (1991).

the other hand, that Kokes had asked him only if he had already invaded the funds, and that he had simply answered, "I did not." As respondent testified at the DEC hearing:

Q. You were sensitive to the fact that he was asking only, according to your testimony, as to whether or not you had invaded the funds but not whether or not you intended to invade the funds. You were sensitive to the fact, you made that distinction when you responded to him, correct?

A. I was.

Q. And that's what you believed to be what his question was to you, correct?

A. The single question, did you do something between the 22nd and my telephone conversation with you now to deplete the funds or the assets, yes.

Respondent met with his client sometime between September 29th and October 3rd to "update [him on] the status of the litigation." In discussing the September 27th letter, Batten was annoyed with respondent for having agreed to reinstate the complaint without first consulting him. At that meeting, Batten informed respondent of his dire financial situation and instructed him to retract his consent to vacate the dismissal order and to obtain the escrow funds. As Batten testified at the DEC hearing:

I was living in the street when I moved from my house with no money. I was living in [A.W.'s] driveway * * * and I just felt as if I had a chance to get the money. * * * I had no other cash. That was my only money.

On September 30th, Kokes hand-delivered to respondent a stipulation to vacate the order of dismissal and a consent order. Respondent testified that he left a telephone message for Kokes on Monday, October 3rd. When he did not receive a return call, he wrote the following letter the next day:

I have been instructed by my client not to consent to an order setting aside the dismissal. Be guided accordingly.

Kokes testified that he had no record of receiving a telephone call from respondent on October 3, 1988.

Respondent testified that he had regarded the September 22nd order as a final order of dismissal. Accordingly, he contacted TiCo on October 4th, told the settlement officer, Francine Shimp, that he had an order dismissing the complaint for failure to answer interrogatories, and requested a release of

the funds. Although respondent testified that he had said nothing to Shimp about the effect of the order, Shimp testified that respondent had told her that "it was okay now to release the escrow funds." Shimp further testified that when she showed the order to her supervisor, Sharon Smith, for her approval of the release of the escrow funds,

> I explained that Harry had brought it in and I had known Harry for a long time, that he was counsel for Cape May County, and had [an] impeccable reputation. I knew that [Smith] didn't really know who Harry was and I tried to explain that * * * I knew who he was and I had no reason to think anything differently.

Both Shimp and Smith testified that if respondent had explained that it was not a final order, they would not have released the funds. In any event, on October 5, 1988, respondent picked up a check from TiCo for the balance in the escrow account in the amount of $16,146.20, payable to the order of respondent and Batten, and deposited it into his trust account.

On October 5th, Kokes received respondent's letter of October 4th. On October 6th, Kokes personally served respondent with a motion to vacate the dismissal order. At that time, Kokes was not yet aware that respondent had withdrawn the escrow funds. Five days later, on October 11th, respondent disbursed $12,500 to Batten, leaving in his trust account $3,646.20, the sum that had been held in escrow for his legal fees, plus accrued interest. On October 18th, respondent filed his papers opposing his adversary's motion to vacate the dismissal order, arguing that the interrogatory answers were not fully responsive and that the proposed form of order was inconsistent with relief permitted by *Rule* 4:23–5(a).

When respondent and Kokes next spoke on October 24th, respondent told Kokes for the first time that he had withdrawn the funds from the escrow account and had disbursed the money to Batten. Respondent told Kokes that he thought the sentence "Be guided accordingly" in his October 4th letter had put Kokes on notice of his intention to invade the escrow account. After Kokes confirmed with TiCo that the account had indeed been closed, he filed an emergent application to

recover the monies. On November 4th, the court signed a consent order that provided for a full accounting of any monies disbursed, immediate recovery by respondent of any recoverable funds and deposit thereof into a joint escrow account, vacation of the September 22, 1988, dismissal order, reinstatement and amendment of plaintiffs' April 21, 1988, complaint, and the continuation of the writ of attachment in full force and effect. Pursuant to that order, respondent wrote Kokes on November 23rd, accounting for Batten's expenditure of the $12,500 disbursed to him, and notifying him that that money was not recoverable. He offered, however, to deposit the $3,646.20 that remained in his trust account into a joint escrow account, which Kokes and respondent subsequently established.

On November 27th, respondent served Kokes with a supplemental set of interrogatories in the *Schwarz v. Batten* matter. When he had not received answers by January 9, 1989 (one day after the *Rule* 4:17–4(b) sixty-day deadline), respondent wrote to Kokes requesting the answers "within the week." Respondent did not warn of "making the appropriate motion" in that letter, however, as he had done in his similar September 9th letter. Although Kokes had left Loveland, Garrett the month before (on December 23rd), he spoke with respondent about the matter on January 16th. Both agree that Kokes informed respondent that he had left Loveland, Garrett to start his own firm (Smith & Kokes) and that he had not retained the case file. Kokes further testified that he told respondent that the plaintiffs needed more time to provide the answers because a new attorney, not connected with Loveland, Garrett, would be representing the plaintiffs, and that respondent "indicated that he understood and apparently had no problem with that." Respondent, on the other hand, said that although he knew that Kokes no longer had the file, he told Kokes that he would hold him personally responsible for getting the answers to him by January 20th. On cross-examination, however, respondent conceded that it was Loveland, Garrett, not Kokes, that remained the

attorney of record until he received notification of substitution of attorney in February 1989.

On January 25th, respondent filed a second *ex parte* application for an order of dismissal for failure to answer interrogatories, and on January 27th, the court signed an order to that effect. On February 9th, the plaintiffs' new counsel filed a motion to reinstate the complaint, supported by Kokes' affidavit that his January 16th conversation with respondent had "left [him] with the distinct impression that [respondent] would *not* be taking advantage of the situation created by the brief period of time it would take to transfer the matter to [substituted counsel]." On March 3rd, the court vacated the dismissal order and reinstated the plaintiffs' complaint.

## II

The DRB concluded that respondent did not violate the Rules of Professional Conduct when he sought and obtained the *ex parte* orders of dismissal in September 1988 and January 1989. Based on our independent review of the record, we agree with the DRB that the record does not support the DEC's findings that the evidence clearly and convincingly establishes that respondent violated the Rules of Professional Conduct when he sought and obtained the *ex parte* dismissal of the complaint on September 22, 1988. The DRB highlighted the relevant facts:

The record does not support the conclusion that respondent had understood that Kokes would supply the answers to interrogatories by September 23, not September 16, 1988. Indeed, as pointed out by respondent, nowhere in Kokes' affidavit in support of his motion to vacate the order of dismissal is there any reference to a September 23, 1988 date. Paragraph 9 of that affidavit reads as follows:

9. On September 13, 1988, attorney for Plaintiff [Kokes] called attorney for Defendant [Respondent] explaining that there was a voluminous amount of documents to copy to fully answer Defendant's interrogatories and the earliest the answers could be transmitted would be September 16, 1988.

In addition, Kokes' handwritten notes, made contemporaneously with the September 13, 1988 telephone conversation with respondent, imply that the answers were to be provided by Friday, September 16, not Friday, September 23, 1988. Those notes read "answers end of week [September 16th] = O.K."

We also agree with the DRB that the record supports the DEC's conclusion that the allegation that respondent agreed to wait a reasonable period of time for the submission of answers to the supplemental interrogatories in January 1989 is not supported by clear and convincing proof.

With respect to the withdrawal of the escrow funds, we agree with the DRB and the DEC that the record clearly and convincingly establishes that respondent's conduct was unethical. Respondent argued that he did not mislead Kokes about his intent to seek the release of the funds in their telephone conversation or in his October 4th letter. He claimed that he had truthfully answered "no" when Kokes asked him in their conversation whether he had invaded the escrow account; he further recounted that he had not yet formed the intention to do so at the time of their conversation. Respondent testified that during his conversation with his client later that day, "the bell went off[,] * * * the light lit up, hey, here was a way of getting the funds out of the court." Respondent further contended that the words "be guided accordingly" in his October 4th letter should have put Kokes on notice that he and Kokes were again in an adversarial posture and that he intended to invade the funds.

The DRB concluded that respondent's conduct towards his adversary

> went well beyond either the act of advocacy or an aggressive approach to litigation strategy. Respondent disarmed Kokes by leading him to believe that he would not—in fact, could not, by [*Rule* 4:23–5(a) ]—pursue the release of the escrow funds, only to do exactly that, in a surreptitious fashion, without notice to Kokes.

We concur with the DRB and find it significant that although respondent claimed that the letter that he had sent to Kokes by regular mail on October 4th put Kokes on notice of his intention to invade the escrow funds, respondent nevertheless had closed the escrow account the next day, the same day Kokes received the letter. We observe, therefore, that the letter could not have served as "fair warning" to Kokes of his intentions

because Kokes did not, in any event, have time to prevent respondent from withdrawing the funds. Furthermore, respondent failed to explain adequately why he disbursed the funds to his client on October 11th, five days after receiving a reinstatement motion from Kokes. Indeed, he indicated that although he did not have firsthand experience with reinstatement motions, he understood that it was likely that the court would grant the reinstatement motion after he had received the interrogatory answers. Although he responded to his adversary's motion on October 18th, he did not inform Kokes that the funds had been disbursed until October 24th, nearly three weeks after the withdrawal.

Further, with regard to respondent's conduct toward TiCo, the DRB concluded:

[Respondent] misrepresented to the title company that the funds could be withdrawn on the basis of the order dismissing the complaint for failure to answer interrogatories. Respondent's contention that the title company released the funds "based upon its own determination of the effect of the order" must be rejected. When respondent, a member of the legal profession, presented the order of dismissal to the nonattorney employee of the title company, it was to be expected that the employee would rely on respondent's legal training, knowledge, and experience, especially when respondent was well known to the employee, maintained a public position of confidence, and enjoyed a fine reputation as a member of the bar.

Here, respondent did not merely present the order to the title company employee and hope that the employee's interpretation of the order would be consistent with his—although even against this backdrop, respondent's conduct would have been unethical. Silence is no less a misrepresentation than words. But here respondent affirmatively assured the bookkeeper [Shimp] that the matter was dismissed and that the escrow funds could be released.

Respondent argued that he believed that the dismissal order was final and that therefore his withdrawal of the escrow funds was proper. His own testimony, however, belies that contention. *Rule* 4:23–5(a) then provided that the delinquent party had thirty days to move to vacate the dismissal order after providing fully-responsive interrogatory answers. Respondent testified that he understood that such a motion was likely to be granted. Hence, he was aware that it was likely that the action on which the writ of attachment was based would be revived.

Respondent relied on *Aujero v. Cirelli*, 110 *N.J.* 566, 542 *A.*2d 465 (1988), to support his contention that the dismissal order was final. In *Aujero*, we decided that a trial court had the discretion to extend the thirty-day reinstatement period provided for by *Rule* 4:23–5(a). *Id.* at 577, 542 *A.*2d 465. Despite the *Rule*'s clear mandate that the complaint of the delinquent party "be dismissed or stricken by the court upon the filing by the party entitled to the answers of an affidavit stating such failure," we recognized that, in practice,

> [p]erhaps, inevitably, * * * [there] is indeed "judicial ambivalence" and "varying degrees of firmness" in application of the Rule. Judges, no less than lawyers, strain to avoid the ultimate sanction of dismissal of an affirmative claim. * * * The purpose of the Rule, designed to expedite litigation, has been frustrated. [*Id.* at 580–81, 542 *A.*2d 465.]

We then referred the matter to the Civil Practice Committee, suggesting a revision of the *Rule* requiring that a motion for dismissal be made on notice to one's adversary. In any event, we observed that the parties in *Aujero* recognized that a *Rule* 4:23–5(a) dismissal was reinstatable, and that they had continued to litigate for five months after the order of dismissal. Thus, nothing in *Aujero* supports respondent's argument that such a dismissal order definitively terminated the underlying action.[2]

Respondent has also maintained throughout these proceedings that the dismissal order was a "further order of the court" pursuant to the court's escrow orders, permitting him to withdraw the funds. Respondent previously had experience (in July 1989) in obtaining a specific order for release of certain funds from the escrow account. As respondent was familiar with the procedure for obtaining such an order and, in fact, conceded at the DEC hearing that an application for a release order would

---

[2]Under the new *Rule* 4:23–5(a), effective September 5, 1990, there is a two-tiered procedure providing for a dismissal without prejudice during the reinstatement period and a dismissal with prejudice if the delinquent party does not move to reinstate the complaint during that period. See S. Pressler, *Current N.J. Court Rules* 4:23–5(a) comment (1991).

not have been successful, the contention that the escrow orders authorized the release of funds is utterly without merit.

We agree with the DRB that

[t]he conclusion is inescapable that respondent embarked on a carefully charted course of action to withdraw the escrow funds: he was well aware that his client was in desperate need of monies; the client wanted respondent to find a quick way to obtain the escrow funds and, in fact, instructed respondent to revoke his consent to the restoration of the case and to "go after the funds;" respondent realized that he might be able to use the September 22 dismissal order to obtain the release of the escrow funds; to that end, he first had to retract his promise to Kokes to sign a consent order, lead Kokes into believing that he would not seek the funds, and then act fast without notice to Kokes. And that is precisely what he did. In view of the foregoing, the Board cannot but conclude that respondent knew that the September 22 order did not end the litigation, but used it anyway to draw out the escrow monies, while well aware that his client might quickly dissipate the funds. Indeed, respondent admitted that he had advised Batten that the case might be restored and that the monies might have to be returned.

To summarize respondent's improprieties: he misrepresented to Kokes that he would not—and could not—seek the release of the escrow funds for a period of thirty days, thus lulling Kokes into a false sense of security that kept him from seeking emergent relief from the court; notwithstanding his assurance to Kokes in that regard, respondent tricked him by furtively withdrawing the escrow funds; and respondent deceived the title company into believing that an order dismissing the complaint for failure to answer interrogatories entitled his client to the escrow funds.

We further find that respondent had violated the court's escrow orders by withdrawing the funds without a proper order of the court. He thereby undermined the purpose of the writ of attachment, which was to guarantee that the funds would be available for the plaintiffs if they won the case.

█ The DRB found that respondent had violated *RPC* 8.4(c) and (d). We agree. Respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation towards his adversary and the title company, in violation of *RPC* 8.4(c). We further find that respondent engaged in conduct that is prejudicial to the administration of justice in improperly withdrawing the escrow funds contrary to the court's prior orders, in violation of *RPC* 8.4(d).

■ Although the DRB recommended that respondent be publicly reprimanded for his misconduct, our independent review of the record supports a different view of the appropriate discipline. "The severity of the discipline must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982). In his various actions, respondent displayed a lack of candor in dealing with his adversary and the title company. In misusing the dismissal order to obtain a release of funds properly held in escrow, respondent acted in a manner that is no less an affront to the integrity of our system of justice than a misrepresentation to the court. *Cf. In re Kernan,* 118 *N.J.* 361, 571 *A.*2d 1282 (1990) (three-month suspension of attorney who transferred property to mother during divorce proceedings without informing court); *In re Johnson,* 102 *N.J.* 504, 509 *A.*2d 171 (1986) (three-month suspension of attorney who misrepresented to court that associate was ill to obtain adjournment). Respondent was doing more than "playing hardball" with his adversary; he was bending the rules to suit his client's interests. Litigation should not be viewed as a contest to be won by sharp practices that attempt to track the letter of the law while dishonoring its purpose. The vast majority of lawyers understand and respect that principle. We regard its observance as fundamental to the ethical practice of the law.

The appropriate discipline under the circumstances is suspension from the practice of law for three months. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including production of transcripts and accounting expenses.

So ordered.

*For suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALD and STEIN—7.

*Opposed*—None.

## CORRECTED ORDER

It is ORDERED that HARRY A. DELVENTHAL, Jr. of OCEAN CITY, who was admitted to the bar of this State in 1973, is hereby suspended for three months, effective June 11, 1991, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.